(No. 73274▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VERNEAL JIMERSON, Appellant.

*Opinion filed May 25, 1995.—Rehearing denied July 6, 1995.*

Raymond L. Prusak, of Prusak & Nudo, Mark R. Ter Molen, Fredrick S. Levin and Andrew L. Reisman,

of Mayer, Brown & Platt, and Andrea D. Lyon, all of Chicago, and Jesse A. Witten, of Nussbaum & Wald, of Washington, D.C., for appellant.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Verneal Jimerson, was found guilty of the murders of Larry Lionberg and Carol Schmal. The defendant waived his right to a jury at his death sentencing hearing, and the circuit court sentenced the defendant to death. On direct appeal to this court, the defendant's convictions and death sentence were affirmed. (*People v. Jimerson* (1989), 127 Ill. 2d 12.) The defendant subsequently filed a petition for post-conviction relief. The circuit court summarily dismissed the defendant's petition, without conducting an evidentiary hearing. The defendant appeals to this court from the dismissal of his post-conviction petition. 134 Ill. 2d R. 651(a).

For the reasons that follow, we reverse the judgment of the circuit court and remand this cause for a new trial.

## FACTS

On May 12, 1978, the bodies of Larry Lionberg and Carol Schmal were found in East Chicago Heights, Illinois. Schmal was found inside a vacant townhouse, and Lionberg was discovered by a creek near the townhouse. Lionberg had been shot in the head and the back.

Schmal had been repeatedly raped and had been shot twice in the head. The couple had apparently been abducted from the service station at which Lionberg was working the nightshift.

Shortly after the murder victims were discovered, investigators for the Cook County sheriff's police department interviewed Paula Gray at the Homewood sheriff's police station. Gray, then 17 years old, lived near the location where the bodies of Lionberg and Schmal were found. Gray eventually gave a statement implicating herself, her boyfriend Kenneth Adams, Dennis Williams, William Rainge and the defendant in the crimes. Gray stated that Lionberg and Schmal were taken into an abandoned townhouse, where Schmal was taken upstairs and Lionberg was kept downstairs. Schmal was raped by the males while Gray held a lighter to illuminate the room in which the rapes were occurring. Schmal was then shot by Dennis Williams twice in the head, while the defendant was downstairs with Lionberg. Lionberg was then taken to a nearby creek, where he was shot two times in the head by Williams and once in the back by Rainge.

Gray appeared before a grand jury on May 16, 1978, and gave this same statement. The grand jury indicted the defendant, Williams, Rainge and Adams. On June 19, 1978, Gray testified at a preliminary hearing at which time she recanted her statement to the grand jury and denied all knowledge of, or involvement in, the crimes. Because Gray was the only witness to connect the defendant to the crimes, the complaint against the defendant was dismissed. However, there was sufficient evidence in addition to Gray's testimony to implicate Williams, Rainge and Adams, and the charges against them stood. Gray was thereafter indicted on charges of murder and four other felonies. Gray subsequently gave sworn testimony denying any knowledge of, or involve-

ment in, the crimes on three additional occasions: (1) her October 1978 suppression hearing; (2) her October 1978 trial; and (3) a January 1979 sentencing hearing.

Gray, Williams, Rainge and Adams were tried simultaneously in 1978 for various crimes arising out of the deaths of Lionberg and Schmal. Williams was convicted of two counts of murder, two counts of aggravated kidnapping and one count of rape, and was sentenced to death. Rainge was convicted of two counts of murder, two counts of aggravated kidnapping and one count of rape, and was sentenced to natural life in prison. Adams was convicted of two counts of murder and one count of rape, and was sentenced to 75 years' imprisonment. Gray was convicted of murder, rape and perjury, and was sentenced to concurrent terms of 50 years' imprisonment for each murder, 50 years for rape, and 10 years for perjury. Gray was subsequently granted *habeas* relief by the Seventh Circuit Court of Appeals on the ground that her trial attorney suffered from a conflict of interest. (*United States ex rel. Gray v. Director, Department of Corrections, State of Illinois* (7th Cir. 1983), 721 F.2d 586.) Williams' and Rainge's convictions were also subsequently reversed, on the ground that their trial counsel was defending an Attorney Registration and Disciplinary Commission (ARDC) proceeding at the time of their trial. *People v. Williams* (1982), 93 Ill. 2d 309; *People v. Rainge* (1983), 112 Ill. App. 3d 396.

Following the reversal of her convictions, Gray agreed to testify for the State against the defendant, Williams and Rainge. In 1984, after Gray agreed to cooperate with the State, the defendant was again indicted for the murders of Lionberg and Schmal. The defendant was tried in October of 1985.

A detailed account of the evidence presented at the defendant's trial is contained in this court's opinion on direct appeal. (*People v. Jimerson* (1989), 127 Ill. 2d 12.)

Briefly, the evidence recounted the commission, by several men and one woman, of the murder of Larry Lionberg and the murder and gang rape of Carol Schmal, following the couple's apparent abduction from the service station at which Larry was working. The crimes occurred on May 11, 1978, in East Chicago Heights, Illinois, between approximately 3 a.m. and 4 a.m.

Following the discovery of the victims' bodies on May 12, 1978, the police received a tip from an anonymous caller that the people responsible for the crimes were in the crowd that had gathered at the crime scene, and that a red Toyota involved in the crimes was also parked nearby. Dennis Williams and the defendant were both present in the crowd at the crime scene. Police Investigators David Capelli and Patrick Pastirik testified that, after they received the tip, they approached the crowd. As they approached, Williams and the defendant began walking away "briskly." Williams and the defendant walked to Williams' car, a red Toyota. According to the defendant, he was going to Williams' car to retrieve a pair of sunglasses he had left there. Capelli and Pastirik arrested both Williams and the defendant at the car.

The anonymous caller was later identified as Charles McCraney, a resident of the neighborhood. McCraney testified that at approximately 3 a.m. on the day of the murders he saw a group of people entering the townhouse in which Schmal's body was found. McCraney was able to identify Dennis Williams, Kenny Adams and William Rainge, and their automobiles, at the townhouse. McCraney stated that, approximately one hour after he observed the group enter the townhouse, he heard a gunshot come from the townhouse. McCraney did not identify the defendant as having been among that group. McCraney did testify, however, that he had seen the defendant in the neighborhood the evening

before, sometime before midnight. McCraney further testified that, when he made his telephone call to the police, it was because he had seen Dennis Williams in the crowd. McCraney was not referring to the defendant when he made this call.

The only witness to connect the defendant to the crimes was Paula Gray. Gray's testimony at the defendant's trial implicated herself, the defendant, Williams, Rainge and Adams. Defense counsel attempted to cross-examine Gray with her testimony at the June 1978 preliminary hearing, in which she denied knowledge of, or involvement in, the crimes. For the most part, Gray denied any recollection of that testimony. Defense counsel did not offer any further evidence showing that Gray gave this prior inconsistent statement, nor did he question Gray regarding any of her other prior inconsistent statements.

Also on cross-examination, Paula Gray was questioned regarding whether she had been promised anything in return for her testimony against the defendant. Gray denied that she had been promised anything in exchange for her testimony.

The State also introduced forensic evidence, through an expert witness, that the defendant had blood type "O" and that he was a "secretor." The State's expert concluded from these results that the defendant was a possible source of bodily fluid found on a vaginal smear taken from Carol Schmal's body.

The defendant presented an alibi defense at trial. The defendant testified that he lived on the north side of Chicago, but that his sister-in-law and her family lived in the neighborhood where the crimes took place. The defendant testified that he was with Dennis Williams early in the evening of May 10, 1978, but that Williams drove the defendant, his wife and his three children home at approximately 8:30 p.m., and that he

was in his home at the time the crimes took place. The defendant's wife and sister-in-law corroborated various parts of his alibi. The defendant further testified that he was 33 years old, that he finished high school at the age of 20, that he was married, that he had three children, and that he held a steady job. The defendant also testified that he had never been convicted of a crime.

The jury deliberated for six hours, after which it delivered a verdict of guilty on both counts of murder. The defendant's death sentencing hearing commenced one month later. At the eligibility portion of the defendant's sentencing hearing, the State relied solely upon the evidence introduced at the defendant's trial, and defense counsel introduced no evidence and gave no argument. The trial judge found the defendant eligible for the death penalty on the basis of the multiple-murder aggravating factor. (720 ILCS 5/9—1(b)(3) (West 1992).) The aggravation/mitigation phase began immediately thereafter. The State again relied solely on the evidence presented at trial. Defense counsel presented one mitigation witness, Elder Charles Nelson, who testified that the defendant would often do maintenance work at Nelson's church and that the defendant was very reliable. The trial judge thereafter sentenced the defendant to death, finding that there had been no mitigating evidence presented sufficient to preclude the death penalty.

### EVIDENCE IN POST-CONVICTION PETITION

The defendant's post-conviction petition identifies the following additional evidence, which, the defendant contends, was not presented at his trial.

The defendant's post-conviction petition attaches evidence regarding a promise by the prosecution to Paula Gray to drop the murder charges against her in exchange for her testimony against the defendant. This evidence will be discussed in detail in the analysis portion of this opinion.

Also filed with the post-conviction petition was the transcript of the testimony of Investigator James Houlihan at the 1978 trial of Williams, Rainge and Adams. According to Investigator Houlihan's testimony, he and another officer were the first to interview Paula Gray at the Homewood station. Investigator Houlihan testified that they first questioned Gray alone, but that she would not cooperate. Investigator Houlihan sought the assistance of Gray's mother, who spoke privately to Paula for 5 to 10 minutes. Gray's mother then announced that Gray would cooperate with the police. The questioning then continued and Gray gave her first statement about the crimes. Houlihan testified that he asked Gray "Who was present the night that this incident occurred ***?" and that Gray responded by naming Williams, Rainge and Adams, but not the defendant. Houlihan was asked on cross-examination, "There was no mention then of Jimmerson [sic]?" to which he answered, "No, sir."

Houlihan testified that his and Jackson's interrogation of Gray was subsequently interrupted by Investigator Patrick Pastirik, one of the officers who arrested the defendant and Williams. After questioning by Pastirik, Gray gave a second statement in which she implicated herself, Williams, Rainge, Adams, and, for the first time, the defendant. Houlihan's testimony was not presented at the defendant's trial, and Gray's statement to Houlihan was not introduced in any other manner at the defendant's trial.

Also filed with the defendant's post-conviction petition was evidence, not presented at the defendant's trial, regarding Paula Gray's mental capabilities. The 1978 presentence investigation report (PSI) prepared for Gray stated that, at age 6, her IQ was measured at 57, classifying her as mentally retarded. Gray was diagnosed as educable mentally handicapped (EMH) and placed in a special EMH classroom. In 1974, Gray's IQ was mea-

sured at 64. A 1974 psychological report attached to the PSI found Gray to be a "timid, insecure and dependent" personality, who has "difficulty interpreting stimuli correctly." Gray's mother stated that Paula's "mind comes and goes." At age 17, Gray was unable to read, write or tell time. The post-conviction petition also brings forth evidence that, on May 18, 1978, two days after her grand jury testimony, Gray was taken to a hospital because of "abnormal behavior" and was admitted to the hospital four days later with a diagnosis of "schizophrenic reaction, secondary to the questioning."

The defendant's petition also identifies additional evidence bearing on the forensic serologic evidence introduced by the State in support of the defendant's guilt. After the defendant's trial, subsequent tests were conducted by Scotland Yard at the request of the State on the same samples examined by the State's expert, Podlecki. The Scotland Yard results were different from those presented at the defendant's trial. The Scotland Yard report concluded that, from these samples, it was unable to determine whether or not the defendant is a secretor or a nonsecretor.

With regard to the death sentencing hearing, the defendant's petition attaches the affidavits of 17 persons, relatives and friends of the defendant, who did not testify at the sentencing hearing. These affidavits recount that the defendant is a loving and kind person, is a good father to his own two children and to his stepdaughter, is active in the church, is always working or looking for work, and has never been a troublemaker, either in school or elsewhere. These affidavits also discuss the defendant's family background, describing that the defendant, his 11 siblings and his parents, lived on a farm in Arkansas as sharecroppers prior to moving to the Chicago area, that the family is very close and that the defendant taught his brother a trade. The affi-

ants also state that they have never known the defendant to be violent. A number of the affidavits recount specific instances of the defendant's "good deeds" toward his family and friends. Each affidavit states that the affiant would have been willing to testify at the sentencing hearing, but that they were not contacted by the defendant's counsel. The petition also attaches the affidavit of Elder Charles Nelson, in which he states that he was not interviewed by defense counsel prior to being called as a mitigation witness for the defendant. Nelson's affidavit recounts additional mitigating evidence which he would have given had he been prepared by defense counsel.

The petition also attaches the affidavit of Chandra Walker, a mitigation specialist for the Capital Resource Center. After the defendant's trial, Walker conducted a social history investigation of the defendant, which revealed that the defendant did not have a record with the juvenile justice system of Arkansas and that he had no record of having caused trouble in school. This report also revealed that the defendant's IQ had been measured at 80, classifying him as borderline retarded, and that he attended special education classes. Finally, the report stated that the defendant had experienced very few problems in prison, that he works on the "gallery," which is considered a privilege for inmates, and that he spends the rest of his time reading and studying his Bible. The report concludes that the defendant has positive rehabilitation potential.

The defendant's petition also attaches the affidavit of a psychologist who conducted an evaluation of the defendant after the defendant's trial. That evaluation finds that the defendant has an IQ of 80 and functions at an intellectual level well below average. The evaluation further finds that the defendant is passive and does not fit the psychological profile for an individual capable

of this type of crime. The report suggests that the defendant could be a "follower" in this type of crime, but that, if that were the case, other factors of his personality would compel him to confess. The report notes that the defendant finished high school, and that he worked most of his adult life, and opines that the defendant compensated for his low intellectual capacity with diligence and hard work.

The defendant's petition also attaches the affidavit of Earl Taylor, the defendant's trial counsel. With regard to the sentencing hearing, Taylor states that he thought the trial judge would not impose the death penalty on the defendant since he was not "the shooter" and that he therefore "went through the motion" on the mitigation portion thinking it was a "lay down." Also in his petition, the defendant makes reference to the fact that Earl Taylor was suspended on the recommendation of the ARDC for one year in 1977 because he had exhibited a "pattern of consistent neglect" toward his representations. *In re Taylor* (1977), 66 Ill. 2d 567, 572.

## ANALYSIS

The defendant raises numerous issues which pertain to the propriety of his convictions and death sentence for the murders of Lionberg and Schmal. We find that one of those issues entitles the defendant to a new trial. Accordingly, we do not reach the remaining issues, as we find that none of them are likely to arise on remand.

The defendant contends that reversal of his conviction and remandment for a new trial is required because the State allowed perjured testimony of its witness to stand uncorrected. Specifically, the defendant asserts that the State's primary witness, Paula Gray, was allowed to testify falsely at the defendant's trial that she had not been promised anything in exchange for her testimony against the defendant. The defendant argues that the State was required to correct this perjured

testimony and that the failure to do so requires that the defendant be granted a new trial. We find that a new trial is warranted on this ground.

At the time of the defendant's indictment in 1984, Paula Gray was in prison awaiting retrial on the murder, rape and perjury charges of which she had previously been convicted. Prior to the defendant's indictment, Gray agreed to testify for the State against the defendant, as well as against Williams and Rainge in their retrials.

At the defendant's trial, defense counsel asked Paula Gray whether she had received any consideration in exchange for her cooperation with the State. Gray gave the following testimony on this subject:

"Q. Has anyone talked to you about how much longer you might have to spend in jail?

A. I don't remember.

Q. Has anyone promised you anything for appearing here in court?

A. No.

* * *

Q. Ms. Gray, since you now remember talking to Mr. Arthur [an assistant State's Attorney], were you promised anything?

A. No.

* * *

Q. Were you told that you would get out of jail earlier?

A. No.

Q. Were you told if you testified that you get out of jail earlier?

A. No.

Q. No promises were made to you by Mr. Arthur at all?

A. No."

The defendant contends that this testimony was false because Paula Gray had, in fact, been promised by the State that the murder charges would be dropped if she testified against the defendant, Williams and Rainge. The defendant's post-conviction petition brings forth the following evidence in support of this conten-

tion. In the State's answer to discovery in their case against Williams and Rainge, which answer was filed prior to the defendant's trial, the State stated that a promise had been made to Paula Gray that "if she testifies honestly, the State will drop the murder charge." Further, the defendant points to the admission of the State, in its brief on direct appeal, that "the jury did not know that the People had agreed to drop the murder charges against Paula if she testified against defendant, Williams and Rainge." Finally, the defendant points to the ultimate disposition of Gray's case, following her testimony against the defendant, Williams and Rainge. The murder and rape charges against Gray were dropped, and she was charged only with perjury, to which she pled guilty and received two years' probation. None of this information was presented to the jury at the defendant's trial.

The State does not appear to dispute in this appeal that the knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process. This court's precedents, in accord with those of the United States Supreme Court, have long recognized that "the deprivation of an individual's liberty based upon false testimony is contrary to fundamental principles of fairness in a civilized society." (*People v. Cihlar* (1986), 111 Ill. 2d 212, 216-17; see also *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173; *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763.) " 'Perjury is the mortal enemy of justice.' " *People v. Griffin* (1992), 148 Ill. 2d 45, 66 (Bilandic, J., concurring in part & dissenting in part), quoting *People v. Shannon* (1975), 28 Ill. App. 3d 873, 878.

In furtherance of these salutary principles, this court has held that, if a prosecutor knowingly permits perjured testimony to be used in a criminal prosecution, "it is incontrovertible that defendant's trial lacked the

fundamental fairness implicit in constitutional guarantees of due process of law, thus entitling him to a new trial." *People v. McKinney* (1964), 31 Ill. 2d 246, 247 (citing *Napue*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, and *People v. Lueck* (1962), 24 Ill. 2d 554).

In *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, the principal witness for the State in an Illinois murder trial, then serving a prison sentence for the same murder, testified that he had received no promise of consideration in exchange for his testimony. The witness had in fact been promised such consideration, however, and the prosecution did nothing to correct the witness' false testimony. The jury was apprised only that a public defender had promised "to do what he could" for the witness. The defendant thereafter filed a post-conviction petition charging that his conviction was obtained through false testimony, which petition was denied by the circuit court. *Napue*, 360 U.S. at 265-66, 3 L. Ed. 2d at 1218-19, 79 S. Ct. at 1175.

The Supreme Court in *Napue* held that the defendant was entitled to post-conviction relief on the ground of the perjured testimony. The Court reasoned:

> "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment [citations]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations.]
>
> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

*Napue*, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177; see also *Giglio v. United States* (1972), 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (reaffirming the holding of *Napue*).

Our precedents likewise have long recognized the serious constitutional implications of the use of perjured testimony to obtain a criminal conviction. In *People v. McKinney* (1964), 31 Ill. 2d 246, an accomplice to a crime, who had pled guilty, testified against the defendant at the defendant's second trial on armed robbery charges. The accomplice had not testified at the defendant's first trial, and that trial resulted in a hung jury. At the defendant's second trial, the accomplice testified that no one had offered him leniency in exchange for his testimony. However, after the trial, a petition was filed by the State to reduce the accomplice's sentence as a result of his cooperation.

The defendant thereafter filed a post-conviction petition on the basis of this false testimony. A hearing was held on the petition at which an assistant State's Attorney testified that, while he had made an offer of leniency to the accomplice prior to the defendant's first trial, that offer had not been accepted, so he considered the offer as no longer valid at the time of the defendant's second trial. The trial court agreed with the assistant State's Attorney's theory that, because no offer of leniency had been made before the second trial, no perjury had been committed. *McKinney*, 31 Ill. 2d at 250.

This court disagreed, finding that, under *Napue*, the prosecutors had a duty to disclose the full background of the accomplice witness' testimony. This court reasoned:

> "We do not believe the constitutional safeguard of due process of law can be made to hinge upon the gossamer distinctions indulged in by the trial court. Any fair appraisal of the record shows that [the accomplice's] denials were couched in terms that he had never been approached

by the State's Attorney's staff and that he had never been offered leniency, and that the jury, which should have been informed of *all* circumstances affecting the credibility and reliability of the witness, was left to believe that such was the case." (Emphasis in original.) (*McKinney*, 31 Ill. 2d at 250.)

The court went on to find that the prosecution's failure to correct the false testimony of the witness denied the defendant a fair trial. The court determined that, "human nature being what it is, we are not prepared to say that the spark of hope kindled by [the State's Attorney's] promise of leniency was not an influencing factor on the appearance and testimony of [the accomplice] at the second trial." *McKinney*, 31 Ill. 2d at 251; see also *People v. Lueck* (1962), 24 Ill. 2d 554 (conviction reversed because codefendant testifying against defendant falsely testified that he had not been offered any inducement by the State to testify).

We find that, applying the clear precedent discussed above, the defendant here is entitled to a new trial. The defendant has charged that, prior to his trial, the State's Attorney's office promised Gray that the murder charges against her would be dropped if she testified against the defendant, Williams and Rainge. This conclusion is amply supported. The State's answer to discovery in the Williams/Rainge case, filed before the defendant's trial, indicates that the State agreed to drop Gray's murder charge in exchange for her testimony against the defendant and other defendants. The record reveals that the prosecutor in the defendant's case agreed that this discovery answer applied to the defendant as well. Moreover, the State has admitted that a deal with Gray existed. In three separate instances in its brief on direct appeal, the State stated that Gray testified against the defendant "in exchange for" the State's agreement not to pursue the murder charges against her.

Further, the ultimate disposition of Gray's case lends

substantial support to the conclusion that the State promised her leniency for her testimony. As noted, Gray was initially convicted of rape, perjury and the murders of Lionberg and Schmal, and was sentenced to 50 years' imprisonment for those crimes. Although her convictions were ultimately reversed based upon her attorney's conflict of interest, she was awaiting retrial at the time of the defendant's indictment. However, instead of being retried, following her testimony against the defendant, Williams and Rainge, all charges against Gray except perjury were dropped. After pleading guilty to the perjury charge, Gray was sentenced to two years' probation. The justices of the Illinois Supreme Court are not required to suspend common sense in evaluating the evidence in the record. A commonsense view of this evidence lends substantial support to the conclusion that Gray's denials of a deal were false.

The State's only substantive response on this issue is to assert that there was no "deal" between the prosecution and Gray. The State peculiarly appears to rely on contract law in arguing that there was no "meeting of the minds." We reject this contention. As discussed above, the record, including the State's own admissions, shows that Gray was promised leniency in exchange for her testimony against the defendant. We further note that this is not a case in which a party is attempting to enforce a contract, such that contract law principles govern. The State has admitted that it had "agreed" to drop the murder charges against Gray if she testified. The fact that this agreement may not have satisfied the traditional requirements for an enforceable contract is immaterial. As this court stated in *McKinney*, 31 Ill. 2d at 250, due process of law cannot hinge upon such "gossamer distinctions."

We further note that we are disturbed by the State's contention that we should disregard the admissions of

an agreement in its brief on direct appeal. The State argues that counsel for the State on direct appeal "was not a party to the alleged agreement" and therefore "could not have known whether the parties had come to a meeting of the minds." We have discerned that at least one of the attorneys appearing for the State on direct appeal also appears as counsel for the State on this appeal, thus rendering this purported disavowment particularly disingenuous.

The State also contends that, even if Gray's testimony was false, we should consider this error harmless. (See *People v. Patterson* (1992), 154 Ill. 2d 414, 466 (an error which implicates due process may be considered harmless in certain circumstances).) We determine that, under the particular facts of this case, the error cannot be considered harmless. On this record, we cannot conclude beyond a reasonable doubt that the error did not contribute to the jury's verdict. See *Satterwhite v. Texas* (1988), 486 U.S. 249, 100 L. Ed. 2d 284, 108 S. Ct. 1792.

As we noted on direct appeal, Paula Gray's testimony was the *only* evidence to link the defendant to these crimes. In 1978, after Gray recanted her grand jury testimony, the charges against the defendant were dismissed. In contrast, Gray's testimony was *not* the only evidence to connect Williams, Rainge and Adams to the crimes. (Notably, Gray did *not* testify at the 1978 trial of Williams, Rainge and Adams, and all three were nevertheless convicted of murder and the other charged felonies.) Charles McCraney, an uninvolved witness, was able to place Williams, Rainge and Adams at the crime scene, but *not the defendant*. The credibility of Gray was thus crucial to the State's case against the defendant.

Moreover, we note that the defendant's post-conviction petition directs our attention to evidence, in

the form of Investigator Houlihan's 1978 testimony, that Gray's first statement to the police implicated Williams, Rainge and Adams, *but not the defendant*. Thus, the credibility of Gray's testimony implicating the defendant is more suspect than was her testimony against Williams, Rainge and Adams. For this additional reason, the case against the defendant was considerably weaker than that against Williams, Rainge or Adams. Accordingly, because of the unique importance of Gray's testimony at the defendant's trial, we find that this error cannot be considered harmless beyond a reasonable doubt. *Napue*, 360 U.S. at 272, 3 L. Ed. 2d at 1222-23, 79 S. Ct. at 1179 ("our own evaluation of the record here compels us to hold that the false testimony *** may have had an effect on the outcome of the trial"); *People v. Salazar* (1994), 162 Ill. 2d 513 (*Reddick* defect in instructions was not harmless beyond a reasonable doubt); *cf. People v. Williams* (1991), 147 Ill. 2d 173, 240-42 (rejecting claim that new trial was warranted because counsel was ineffective in failing to prove-up impeachment of Gray with the State's discovery response admitting to a deal, finding that presentation of the discovery response would not have resulted in a different verdict in that case, where substantial evidence other than Gray's testimony linked Williams to the crimes).

The State has also argued that we should consider this issue waived because of the defendant's failure to raise it on direct appeal. We do not believe that waiver is appropriate in this instance. First, there appears to be much confusion as to what evidence on this issue was or was not contained in the record on direct appeal. We find no reference to the State's answer to discovery in the Williams/Rainge case having been contained in that record. Further, it appears from the defense brief on direct appeal that defendant's counsel on that appeal

erroneously believed that the circumstance of Gray's "deal" *had* been presented to the jury. The record of the defendant's trial, however, reveals that the jury did not hear of this circumstance.[1] Given this confusion, we do not deem waiver appropriate here.

Further, we find that this issue implicates principles of fundamental fairness. This court has recognized that strict application of the waiver doctrine should be relaxed where fundamental fairness so requires. (*People v. Cihlar* (1986), 111 Ill. 2d 212, 218; *People v. Burns* (1979), 75 Ill. 2d 282, 290.) In *Cihlar*, the defendant had failed to raise, on direct appeal, the issue that his conviction had been obtained through false testimony, even though the evidence showing the alleged falsity was brought out in the defendant's post-trial motion, prior to the direct appeal. This court nevertheless held that, due to the seriousness of the potential error, fundamental fairness required that the waiver rule not be applied. (*Cihlar*, 111 Ill. 2d at 218; *People v. Flowers* (1990), 138 Ill. 2d 218 (applying fundamental fairness exception to allow review of issue already decided by reviewing court on direct appeal).) We find that this same result is warranted in this case. We note that the defendant has also argued that the failure to raise this issue on direct appeal was the result of ineffective assistance of appellate counsel. Having held that waiver does not apply here, we need not address that contention.

For the foregoing reasons, we find that the defendant's claim that Paula Gray committed perjury in denying the existence of any inducement to testify establishes a violation of the defendant's right to due

---

[1] We note that the dissenting opinion authored by Justice Clark on direct appeal also seems to suggest that the fact of Gray's deal was before the jury. Again, our review of the record reveals that the jury did not receive this information. The State does not contend otherwise on this appeal.

process that warrants a new trial. Ordinarily, at this juncture of the case, we would remand for an evidentiary hearing on this issue. However, we find that an evidentiary hearing in this instance would be an unnecessary expenditure of judicial time and resources. The record before us provides us with ample evidence that the defendant's right to due process was violated, and that this violation undermines the reliability of the defendant's trial. Under the unusual circumstances of this case, we find that the defendant is entitled to a new trial.

We emphasize again that this case differs substantially from the cases against Dennis Williams, William Rainge and Kenneth Adams arising out of the same crimes. The facts and circumstances of this case are unique. Our holding here is not intended to diminish in any way this court's holding in *People v. Williams*, or the holdings of the appellate court in Rainge's and Adams' appeals. See *People v. Salazar* (1994), 162 Ill. 2d 513, 526-32 (Bilandic, C.J., concurring).

## CONCLUSION

For the foregoing reasons, we reverse the defendant's convictions and remand the cause to the circuit court for a new trial.

*Reversed and remanded.*