THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHEN PARIS, Defendant-Appellant.

Fourth District   No. 4—96—0231

Opinion filed March 25, 1998.

Daniel D. Yuhas, Gary R. Peterson, and Chris Buckley, all of State Appellate Defender's Office, of Springfield, for appellant.

Patrick W. Kelley, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

Following a jury trial, defendant was convicted of first degree murder (felony murder), armed robbery, and unlawful use of a weapon. 720 ILCS 5/9—1(a)(3), 18—2(a), 24—1(a)(4) (West 1994). Defendant was sentenced to concurrent terms of 20 years' and 15 years' imprisonment on the murder and armed robbery convictions, respectively, and a consecutive sentence of 2 years' imprisonment on the unlawful use of a weapon conviction. On appeal defendant argues (1) the trial court abused its discretion in quashing subpoenas issued to the attorneys for the State and two of his codefendants, and (2) he was denied effective assistance of counsel on the unlawful use of a weapon charge.

Defendant's conviction was a result of events that occurred on October 23, 1994. On that evening, Jason Smith, along with two

masked men, Shain Ford and Terrence Woods, entered the residence of Michael Talley in Springfield. The three intruders, who were armed with handguns, demanded money and drugs. One of the masked men, Woods, shot and killed one of Talley's guests. After the shooting, Talley gave a box containing money and drugs to Smith, who then gave the box to one of the masked men, and the three fled the house.

Smith spoke with police the following day, October 24, and identified Shain Ford and Terrence Woods as suspects in the shooting incident. Smith also indicated that defendant had given him a ride from Springfield to Decatur following the shooting. On October 25, 1994, Ford told police that defendant had information regarding the incident.

During an interview with the police on November 1, 1994, defendant gave a statement and confirmed that on the evening of October 23, 1994, he drove Smith to Decatur. On the way to Decatur, Smith told defendant that Woods had shot someone. On January 5, 1995, the police followed defendant while he was driving his car to his mother's residence. After defendant reached his mother's residence, emerged from his car, and spoke with police, he agreed to go with them to the station to talk about additional information police had received from Smith and Ford regarding the October 23 incident. As defendant and police were getting ready to leave the premises, defendant approached his car. When Detective Young asked defendant if any weapons were located inside his car, he responded that a .380 gun was in the glove box and its clip was on the driver's visor. The police took possession of the handgun, which was not loaded, and the clip, which contained seven rounds. Defendant and police proceeded to the police station as planned, where defendant gave another statement.

At the station defendant gave a statement describing to police the events that transpired on October 23. Defendant drove Smith, Ford, and Woods to Talley's residence on that evening in order to obtain marijuana. Defendant dropped the three men off at Talley's residence and agreed to pick them up on a street near the house. Ten to fifteen minutes later, defendant heard a shot, saw the three men running toward the car, and saw Ford carrying a metal box. Inside the car, Smith indicated Woods had shot someone. Defendant drove the men to his house, where they split up the marijuana and money contained in the metal box. After defendant gave that statement, Officer Young contacted Assistant State's Attorney (ASA) Walker about finding the gun in defendant's car. Defendant was subsequently arrested and charged with unlawful use of a weapon as a result of the

police finding the .380 gun in defendant's car. But, at that time, he was not charged with anything relating to the events on October 23, 1994. During a January 6, 1995, interview, defendant acknowledged he knew about the plan to rob Talley prior to driving the three men to the house. Defendant was charged by information on January 12, 1995, with first degree murder, armed robbery, and unlawful use of a weapon.

Both Smith and Ford testified against defendant at defendant's trial and against Woods at his trial. While testifying at defendant's trial, both Ford and Smith incriminated themselves in the October 23 shooting incident. After he testified at Woods' trial and before he testified at defendant's trial, Smith sent a letter on November 28, 1995, to ASA Walker requesting leniency in his sentencing. At defendant's trial Smith testified that his trial had been continued on numerous occasions and eventually was to take place after the completion of defendant's trial. However, Smith denied the State had offered him a deal in exchange for his testimony against defendant. Smith testified that he had not made a deal with the State regarding the sentence he would receive in his case, but that one reason he testified against defendant was because he had an expectation he would get some type of deal.

During his testimony, Smith described in detail defendant's role in the robbery. According to Smith, he and defendant had discussed robbing Talley in the past, as well as on October 23. Defendant recommended to Smith that they get Woods to help them in the robbery. When Smith picked up defendant that evening, defendant gave Smith a loaded .380 chrome handgun. After defendant and Smith picked up the other two men, defendant drove the men to Talley's house, waited in the car during the robbery, and drove the men back to his house.

Ford also testified as to defendant's role in the robbery. Ford testified that in the car on the way to Talley's he saw defendant give Smith a gun. Ford also indicated that defendant drove the men to Talley's house, and on the way, all four discussed the robbery plan. Following the robbery, defendant drove the men back to his house, where they split the proceeds.

Like Smith, Ford testified that his trial was continued several times and he was awaiting trial at the time of defendant's trial. Ford also denied having a deal with the State and denied the State ever told him he would get a particular sentence for his testimony against defendant and Woods. Ford did testify that one reason he was testifying against defendant and Woods was his expectation that he would get a deal from the State, but that no one from the State's Attorney's office or the police had ever indicated that he was facing anything

less than 20 to 60 years' imprisonment for first degree murder. The court instructed the jury that the testimony of coconspirators should be viewed with caution.

On December 18, 1995, defendant was found guilty of the three offenses charged: first degree murder, armed robbery, and unlawful use of a weapon. On March 20, 1996, both Smith and Ford entered negotiated guilty pleas to armed robbery and home invasion, while the first degree murder charges against both were dismissed.

After denying defendant's motion for a new trial, the court sentenced him. Defendant then filed motions to vacate judgment and reduce sentence. In his motion to vacate judgment, defendant alleged that the chronology of events in his case indicated that Smith and Ford knew a deal with the State was in effect when they testified against defendant, but that they denied the existence of a deal during their testimony. Defendant argued that he was denied due process since the State, during his trial, did not correct Smith's and Ford's testimony to reflect that the State in fact had a deal with Smith and Ford in exchange for their testimony against defendant. In support of that motion, defendant subpoenaed ASA Walker, Ford's attorney, and Smith's attorney. It was defendant's attorney's expectation that at the hearing on the motion to vacate judgment, the testimony of the subpoenaed attorneys would establish that a deal had been reached between the State and Smith and Ford before defendant went to trial.

ASA Walker and Ford's attorney moved to quash the subpoenas. While Smith's attorney did not appear, ASA Walker indicated Smith's attorney was joining in the motion to quash the subpoenas. The court did not require Walker to testify under oath and she was not questioned by defendant's attorney. ASA Walker noted that she was bound by her oath as an officer of the court and stated that Smith and Ford had not been told of a deal at the time they testified against defendant and "there was no firm deal or offer" given to Ford's attorney or to Smith's attorney until after the completion of defendant's trial. Walker also explained that there were no negotiations by any of the parties prior to Smith's and Ford's testimony at defendant's trial. Ford's attorney agreed with ASA Walker, as an officer of the court (not under oath other than that) as to the negotiations between the State and his client. The court denied defendant's motion to vacate and explained "you have the statements which I consider to be sworn by the two officers of this Court, one on either side of those negotiations, which said clearly that no deal was struck and beyond that I'm not going to permit you to go."

The court did grant defendant's motion to reduce sentence on the

felony murder conviction from 30 years' to 20 years' imprisonment. The court noted that Smith had entered a plea for 18 years' imprisonment and Ford had entered a plea capping his imprisonment at 20 years. The court explained further, "Mr. Smith and Mr. Ford, who also went into the house with loaded weapons, got eighteen and let's say twenty each, and Mr. Paris, who's the driver, wasn't even inside the house, sentenced to thirty years, and that sentence fails the test, my test of fairness based on proportionality."

■ On appeal, defendant argues the trial court abused its discretion by quashing the subpoenas issued to the ASA and Smith's and Ford's attorneys. Defendant asks that we remand the cause for a hearing on that issue and allow defense counsel to call the ASA and Smith's and Ford's attorneys and examine them under oath as to any deal between the State and Smith and Ford at the time they testified at defendant's trial. The State argues that defendant has waived this issue because he failed to raise it in his first posttrial motion. Failure to raise an issue in a posttrial motion results in a waiver of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988). In this case, defendant did not waive this issue on appeal, as it was properly included in a timely filed posttrial motion.

■ A violation of due process occurs when the State allows the presentation of known false evidence to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972). It is the responsibility of the prosecutor to disclose "any understanding or agreement" it has entered into to procure the testimony of a witness, as such an understanding is relevant to the credibility of the witness. *Giglio*, 405 U.S. at 154-55, 31 L. Ed. 2d at 109, 92 S. Ct. at 766; *People v. Jimerson*, 166 Ill. 2d 211, 225-26, 652 N.E.2d 278, 285 (1995). The prosecutor must disclose the full and true background for the appearance of a witness, including any unspoken understanding between the witness and the State. *People v. McKinney*, 31 Ill. 2d 246, 250, 201 N.E.2d 431, 433 (1964); *People v. Nino*, 279 Ill. App. 3d 1027, 1037, 665 N.E.2d 847, 854 (1996).

■ The special witness doctrine is applicable to prosecutors, judges, and, in certain circumstances, criminal defense attorneys and reporters. The doctrine provides that when a defendant in a criminal case subpoenas the prosecutor or judge (or presumably a criminal defense attorney), the trial court should conduct a hearing to determine whether it will permit those subpoenas to stand. A defendant must make a plausible showing that the testimony sought is material and favorable to his defense. *People v. Palacio*, 240 Ill. App. 3d 1078, 1096-97, 607 N.E.2d 1375, 1386 (1993). At the hearing, the defendant must (1) state the testimony he expects to elicit from the

subpoenaed witness, (2) why that testimony is relevant and necessary to his case, and (3) the efforts he has made to secure the same evidence through alternative means. A court of review will not overturn a trial court's determination on whether to quash such a subpoena absent an abuse of discretion. *Palacio*, 240 Ill. App. 3d at 1102, 607 N.E.2d at 1390.

We hold that the trial court did not abuse its discretion by quashing the subpoenas and not requiring the attorneys to be sworn. The trial court did conduct a hearing to determine whether it would permit those subpoenas to stand. The court asked the attorneys if, as officers of the court, any deal between the State and Smith and Ford had been reached in return for their testimony at defendant's trial. The ASA indicated that no firm deal had been reached and that no negotiations had taken place between the State and the two witnesses before they testified at defendant's trial. Ford's attorney agreed with ASA Walker's representations. After these comments by the attorneys, there was no basis for defendant to believe a deal had been reached between the State and Ford and Smith before they testified at defendant's trial. Furthermore, at defendant's trial, the jury was fully apprised of the exact situation existing at the time Smith and Ford testified. Both witnesses denied any agreement had been reached with the State. Their credibility was, however, attacked because both stated that one reason for testifying against defendant was their expectation that they would get some type of deal from the State.

Even if the trial court erred in quashing the subpoenas, and even if the State in fact failed to disclose a deal between the State and the two witnesses, such error is harmless. At trial, the State presented other evidence, apart from Smith's and Ford's testimony, that overwhelmingly supported a finding of defendant's guilt. Talley testified that one to two months prior to the robbery defendant asked him if he had ever been robbed and if he knew Terrence Woods. In addition to Talley's testimony, defendant also told Talley to be careful. Defendant also gave statements to the police implicating himself in the crime. In those statements, defendant described his role in the robbery, taking the three men to Talley's house and driving them to his house after the robbery, where they split the proceeds. Defendant also admitted he knew about the robbery plan prior to driving the men to Talley's house.

Defendant's final contention on appeal is that he was denied effective assistance of counsel on the unlawful use of a weapon charge. Defendant argues his counsel was ineffective because she failed to impeach a witness for the prosecution and failed to develop an avail-

able defense. Defendant contends the errors resulted from ignorance of the law, as opposed to trial strategy, and that but for counsel's errors, there is a reasonable probability that the verdict on the unlawful use of a weapon charge would have been different.

After defendant gave a statement to the police and was arrested and charged with unlawful use of a weapon on January 5, 1995, his counsel filed a motion to suppress, alleging defendant's statement was the fruit of an illegal arrest. The motion was premised, in part, on the theory that defendant's possession of the weapon was not unlawful because it was in a "non-functioning state," an exemption to the unlawful use of weapons statute. 720 ILCS 5/24—1(a)(4), 24—2(b)(4) (West 1994). Defendant claimed his weapon was in a "non-functioning state" because its firing pin was broken.

At the hearing on the motion to suppress, Detective Young acknowledged that when he recovered the gun from defendant's car on January 5, defendant told him that the firing pin on the gun was broken. Detective Young went on to testify regarding this matter:

"Q. [By defense counsel]: Was the firing pin in working order when you confiscated it from him?

A. I believe it was broken. I'm not for sure. I'm trying to remember.

Q. So the gun was nonfunctioning, is that correct?

A. If the firing pin was broken—and I can't remember; I believe it should be in my report—the gun would be nonfunctioning, yes.

\* \* \*

Q. All right. And you did just testify that you believed [the] firing pin on the gun was nonfunctional, is that correct?

A. I can't recall specifically, but I know in conversation with him he said he has dry fired it before; and as a result of that, the fire pin broke."

On redirect examination by the prosecutor, Detective Young testified:

"Q. Could you tell at that point [when the gun was removed from the car] whether or not the firing pin was broken?

A. No, ma'am.

Q. And, in fact, what does it take to find out that the firing pin is broken?

A. You have to actually take the gun apart in a manner to expose the firing pin. Either that or you could fire it and if it didn't fire you assume that something was functionally wrong with it and check it and see if the fire pin was broken or not.

Q. Did you do any of those?

A. No, ma'am."

At trial, Detective Young also testified as to whether the firing pin on the gun found in defendant's car was in working order:

"Q. [By prosecutor]: Are you able by looking at it to examine the firing pin?

A. Yes, I am.

Q. And can you describe the condition of the firing pin?

A. It's in working order."

At trial, defense counsel did not attempt to impeach Detective Young with his testimony from the hearing on the motion to suppress.

After his conviction, defendant filed a motion for a new trial. In the motion, defense counsel emphasized that whether the firing pin on defendant's gun was broken was of paramount importance in the trial. Defense counsel explained:

"Detective Young's testimony at trial, was false regarding his knowledge of the condition of the gun. He lied when he said he could tell if the firing pin was broken, just by looking at the gun. Attorney Reid [(defense counsel)] was surprised by Detective Young's testimony, since it was completely the opposite of what he said at the Motion to Suppress. However, not immediately knowing which of his testimonies was true, she could not impeach him. Attorney Reid had relied on Detective Young's previous testimony, at the Motion to Suppress, that you had to take a gun apart, or fire it, to see if the firing pin was broken. She had no reason to inquire further on that issue, because Detective Young had testified in the defendant's favor at the Motion to Suppress. She had not inquired, prior to the trial, of any experts on the issue, because she didn't believe Detective Young would change his testimony.

However, after the trial, Attorney Reid discovered that you *cannot* positively tell if a firing pin is broken on a gun, unless it is taken apart or fired. It was not for lack of due diligence that this information was not discovered earlier. Detective Young's perjurious testimony was not anticipated or expected by the defense.

The State had ample opportunity before the trial, to fire the gun or to take it apart, to see if the firing pin was broken. It was their burden to prove that the defendant's arrest was lawful, and they failed to meet that burden when they failed to test the weapon. Instead, they introduced the perjurious testimony of Detective Young to support their case."

■ A person commits the offense of unlawful use of a weapon when he knowingly carries or possesses a gun in any vehicle except when he is on his land, in his abode, or fixed place of business. 720 ILCS 5/24—1(a)(4) (West 1994). However, the offense does not apply when a person is transporting weapons that are broken down in a "non-functioning state." 720 ILCS 5/24—2(b)(4) (West 1994). The Criminal Code of 1961 also provides that the defendant has the

burden of proving any exemption to the offense, including the "nonfunctioning state" exemption. 720 ILCS 5/24—2(h) (West 1994).

On appeal, defendant asserts that he was denied effective assistance of counsel on the unlawful use of weapons charge because (1) his trial counsel did not impeach Officer Young's trial testimony, and (2) his trial counsel failed to adequately develop the exemption to the charge because she believed the burden was on the State to prove defendant's weapon was functional. To support his contentions, defendant points to the motion for new trial, where defense counsel noted that (1) she could not impeach Officer Young's testimony because she did not know whether his testimony at the hearing on the motion to suppress or at trial was true, and (2) it was the State's burden to prove that defendant's arrest was lawful and because it failed to test the weapon to determine whether its firing pin was broken it failed to meet its burden. Defendant asserts that, based on this misunderstanding of the law (that the State had to prove the gun was in working order, not that the defendant had to prove he was entitled to an exemption), trial counsel failed to conduct an independent investigation into whether the firing pin was functional. And on the impeachment issue, defendant argues that impeachment of a witness does not require the attorney to know which of the two statements was accurate, and that Young's statement from the hearing on the motion to suppress could have been offered as substantive evidence, because it was made under oath at a hearing. 725 ILCS 5/115—10.1 (West 1994).

■ In order to establish ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687-88, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Young's testimony at the suppression hearing, that defendant told him the firing pin was nonfunctioning but he had not tested the gun to see if it was in working order, and his testimony at trial, that the firing pin was in working order, suggests that Young took the necessary steps between the suppression hearing and trial to determine the firing pin was not broken. Defense counsel could have attempted to impeach Young with his testimony from the suppression hearing, but had she done that, she ran the risk that Young

would identify the steps he had taken since the suppression hearing to determine whether the firing pin was broken. Furthermore, there was no significant inconsistency between Young's testimony at the suppression hearing and at trial, as Young was referring to two different timetables: at the suppression hearing he explained what he had found at the time he had discovered the weapon, while at trial he explained what he had found since the suppression hearing. See *People v. Whitelow*, 215 Ill. App. 3d 1, 5-7, 574 N.E.2d 253, 256-57 (1991) (where defense counsel was not ineffective in not introducing as substantive evidence police testimony from the preliminary hearing that there was no damage to the victim's car, where the officer testified at trial that he observed scratches on victim's car. There was no significant inconsistency between the two testimonies, where the officer viewed the car at two different times to check for damage).

Defense counsel should have made some effort to investigate whether the firing pin was broken, to determine if the "non-functioning state" exemption applied to defendant. However, it is not clear from this record that she did not do that. It appears defense counsel may have had information that led her to believe the firing pin was not broken, or she knew of the steps Officer Young had taken since the suppression hearing to determine the firing pin was not broken, prompting her decision not to impeach Young with his suppression hearing testimony.

■ We hold that defense counsel was ineffective only if the gun's firing pin was broken. Other than defendant's statement to Officer Young that the firing pin was broken, there is no evidence to support the conclusion that in fact the firing pin did not function. Unlike many questions that must be decided in a criminal trial, the question of whether this firing pin is broken may be answered with great certainty. Due to the lack of evidence in this record as to the non-functioning of the firing pin, we do not find ineffective assistance of counsel. However, if evidence is developed establishing that the firing pin is in fact broken, defendant could present that evidence by way of a postconviction petition.

For the foregoing reasons, we affirm the judgment of the circuit court of Sangamon County.

Affirmed.

GREEN and STEIGMANN, JJ., concur.