NOTICE

Decision filed 10/25/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180381-U

NO. 5-18-0381

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 09-CF-2799 |
| | ) | |
| THOMAS STEWART, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the defendant is unable to establish that a witness presented perjured testimony, the defendant did not make a substantial showing of a *Brady v. Maryland*, 373 U.S. 83 (1963), violation, and thus the trial court's dismissal of his postconviction petition was appropriate. Where the defendant's sentence pursuant to the Habitual Criminal Act (730 ILCS 5/5-4.5-95 (West 2008)) was constitutionally appropriate, appellate counsel did not provide ineffective assistance of counsel on direct appeal for failing to challenge the sentence as unconstitutional.

¶ 2    The defendant appeals from dismissal of his postconviction petition at the second stage. He raises two issues on appeal. First, he claims that he presented a substantial showing of a *Brady v. Maryland*, 373 U.S. 83 (1963), violation because his amended postconviction petition and its exhibits established that the State did not disclose an agreement it had with its primary witness,

1

and because the State allowed this witness to commit perjury at trial. Second, the defendant claims that he made a substantial showing that his appellate counsel provided ineffective assistance by failing to challenge the constitutionality of Stewart's sentence of life without the possibility of parole. For the reasons that follow in this order, we affirm the trial court's dismissal of the defendant's postconviction petition.

¶ 3                                    BACKGROUND

¶ 4     The defendant was convicted on two counts of home invasion in violation of section 11-1.20(a)(3) of the Criminal Code of 1961 (720 ILCS 5/11-1.20(a) (West 2008)). The court appointed a public defender to initially represent the defendant. After that attorney encountered a conflict of interest, that attorney was allowed to withdraw, and another attorney was appointed to represent the defendant. Before trial, the defendant formally asked the court to allow him to represent himself.  Although the trial court admonished the defendant that acting as his own attorney was ill-advised, the court granted the defendant's request. The trial court suggested the possibility of appointing standby counsel, but the defendant rejected that possibility and proceeded *pro se*.

¶ 5     Numerous witnesses testified at trial. We summarize the trial evidence in the following paragraphs.

¶ 6     The crime occurred during an evening in November of 2009. Julius "Little Rick" Morgan, his brother, William Morgan, and friends Niko Womack, Ashley Powell, and Ramon McGown were watching television at Julius's house. William was asleep in a chair in Julius's room. Julius's six-year-old son was asleep in his bedroom. Julius and Ashley were drinking beer, but they did not

consider themselves to be intoxicated. William was the only person in Julius's house that night who possessed marijuana.

¶ 7    Without warning, someone wearing gloves and a ski mask entered the living room from the kitchen. The intruder had a gun and ordered everyone there to get down onto the floor. Julius reached for the intruder's gun. Niko, Ashley, and Ramon ran out of the house. A few minutes later, William also fled the home. Julius and the intruder fought over the gun and ended up fighting on the kitchen floor. During this struggle, the gun discharged twice. One of the shots struck the back door, while the other shot went into the living room. During the fight, the gun's clip fell out. Julius grabbed the clip and threw it out of the intruder's reach. Julius pulled a knife from a kitchen drawer and tried to stab the intruder, but the knife broke. Julius did not know whether he stabbed the intruder.

¶ 8    The intruder then started speaking, saying, "Rick," and "I didn't know it was you," and then made a statement that led Julius to believe that there could be additional people outside, and so Julius locked the back door. The intruder took off the gloves and ski mask. Julius recognized the intruder as Thomas Stewart, the brother of a close friend. Julius was not personally acquainted with the defendant but did know who he was. Stewart grabbed for the gun again. Julius pretended to call the police on his cell phone, prompting Stewart to run out of the house.

¶ 9    The police arrived at Julius's house. Julius identified Stewart from a photographic lineup. Julius testified that he did not know how Stewart got into his house because his doors and windows were equipped with an alarm system. Julius did notice that his bathroom window was open, which he said was unusual because of the November date. Stewart's brother cleaned up after Julius's dog

3

and had cleaned for Julius earlier that day. Julius theorized that Stewart's brother left the bathroom window open to provide access to Stewart later that evening.

¶ 10    Julius testified that he was on probation following a conviction for manufacturing marijuana and that he used to sell marijuana, but that he had never sold marijuana to the defendant and was not planning on selling marijuana to the defendant on that night. Julius denied that he made a deal with the State in exchange for his trial testimony.

¶ 11    Niko, Ramon, and Ashley ran to the homes of neighbors to get help while Julius and the defendant were fighting in the kitchen. A neighbor called the police. Upon arrival, the police were sent to Julius's house. Niko and Ashley could not identify the intruder because his face was covered by the mask.

¶ 12    William separately called the police from his cell phone. The responding police officer testified that William was visibly upset. William told the police that the intruder left the scene in a blue truck. William testified that the blue truck belonged to the defendant's brother.

¶ 13    The intruder was gone by the time the police arrived at Julius's house. The police noted that Julius was upset, and that the kitchen had been the scene of a major struggle with the kitchen table flipped over. The officers found two buttons on the ground just outside the bathroom window. They also found two spent shells in the kitchen, along with a ski mask, gloves, and a broken kitchen knife. Later, the police determined that the two shells had been fired from the same gun. The officers did not find any guns or marijuana in Julius's house. The officers processed the bathroom windowsill, the kitchen knife, and the shell casings for fingerprints, but no prints were found.

¶ 14    Two days after the incident at Julius's house, the defendant voluntarily went to the police station to answer questions. The officer who questioned the defendant noticed that the defendant

4

had a gunshot wound on his right arm in addition to a small cut on his stomach. On that date, the officer did not test for gunpowder residue or DNA, but a DNA sample was later obtained and matched DNA extracted from the ski mask found in Julius's kitchen. However, the scientist who testified indicated that DNA could be transferred from one object to another, and that there was no test to determine the length of time that the defendant's DNA could have been on the ski mask.

¶ 15    At the conclusion of the State's presentation of evidence at trial, the defendant informed the court that he wanted to call Madison County Sheriff's Deputy William Marconi to testify about what the defendant said to him at the police station. The trial court told the defendant that he could ask Deputy Marconi questions about the voluntariness of the defendant's appearance at the police station and that he and Deputy Marconi had talked with each other. However, the court told the defendant that he was not allowed to get into any details about their conversation. The defendant also sought the court's permission to play recordings of the statements made by the State's witnesses to the police to highlight inconsistencies. The trial court allowed the defendant to call the officer involved with these statements but did not allow him to play the recordings for the jury.

¶ 16    After deliberation, the jury found the defendant guilty of home invasion. The court scheduled sentencing for January 5, 2011. The State argued that the defendant qualified for a habitual offender sentence, and the court then continued the hearing to review the applicable law. Before the sentencing hearing could resume, the defendant asked the court to appoint an attorney to represent him at sentencing.

¶ 17    Appointed counsel filed a posttrial motion raising two issues: (1) that the trial court erred in not allowing the defendant to play the recordings of the statements made by the State's witnesses as impeachment and (2) that the court erred in allowing the defendant to proceed *pro se*. Appointed

counsel also filed a motion to counter the State's argument that the defendant was a habitual offender.

¶ 18    On March 23, 2011, the sentencing hearing resumed. The posttrial motion was denied. The trial court concluded that the defendant was eligible to be sentenced as a habitual criminal even though his first Class X felony occurred when he was a juvenile. The court sentenced the defendant to a term of natural life imprisonment. The trial court denied the defendant's motion to reduce his sentence.

¶ 19    The defendant filed a direct appeal with this court in which he argued that the trial court erred by refusing to appoint counsel, or to consider appointing standby counsel, to assist him during trial. On January 31, 2013, we affirmed. *People v. Stewart*, 2013 IL App (5th) 110179-U. On May 29, 2013, the Illinois Supreme Court denied the defendant's petition for leave to appeal. *People v. Stewart*, No. 115754 (Ill. May 29, 2013).

¶ 20    The defendant filed a *pro se* postconviction petition on November 18, 2013. He raised the following four claims: (1) that he received ineffective assistance of sentencing counsel because his attorney did not challenge the applicability of his juvenile conviction; (2) that the trial court denied his right to confront and cross-examine his accuser because of limitations imposed upon his cross-examination; (3) that the State engaged in prosecutorial misconduct by having witnesses provide false or misleading testimony; and (4) that he received ineffective assistance of appellate counsel because other claims were not raised. The trial court advanced the defendant's petition to the second stage and appointed counsel to represent him.

¶ 21    The State filed a motion to dismiss the defendant's postconviction petition arguing that his claims were either barred by *res judicata* or were otherwise meritless. The defendant's appointed

6

counsel filed a motion for leave to amend the defendant's *pro se* petition. Appointed counsel adopted the defendant's four *pro se* claims and added additional factual support. Counsel also added three additional claims: (1) that the late substitution of counsel deprived the defendant of his right to counsel without notice and an opportunity to be heard, and was also the product of an artificial conflict of interest created by the State; (2) that the delay that resulted from the late substitution of counsel allowed the State to obtain additional evidence against the defendant; and (3) that appellate counsel was ineffective because these issues were not raised on direct appeal. The State filed a motion to dismiss the amended petition.

¶ 22    On March 31, 2015, the defendant filed a *pro se* amended postconviction petition with the following eight claims: (1) that he received ineffective assistance at sentencing; (2) that the trial court denied his right to confront and cross-examine his accusers; (3) that he was denied due process because the State did not disclose exculpatory evidence regarding plea deals or offers the State made to certain witnesses to secure testimony; (4) that he was denied due process by the State who failed to correct false or perjured testimony from the victim; (5) that he was denied his speedy trial rights; (6) that he was denied his right to self-representation when the court denied his request to make an offer of proof; (7) that he received ineffective assistance of appellate counsel because the first six issues were not raised on direct appeal; and (8) that the trial court erred by failing to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). On June 1, 2016, appointed counsel filed a second motion to amend and adopted the claims made by the defendant in his second *pro se* petition. The State filed a motion to dismiss the defendant's petition. The trial court held a hearing on the defendant's petitions on March 14, 2017.

7

¶ 23    After the March 14, 2017, hearing, the trial court issued its order dismissing the defendant's postconviction petition on July 30, 2018. In its order, the court analyzed each of the defendant's claims. The court held that the defendant's claim that appointed sentencing counsel was ineffective for not challenging the validity of the juvenile conviction as a qualifying offense was rebutted by the record because sentencing counsel tried to exclude the juvenile conviction and because the defendant waived the issue by failing to raise it in his direct appeal. The trial court also found that the record rebutted the defendant's claim that he was the victim of prosecutorial misconduct—that the State allowed the victim to testify untruthfully about his criminal record and about a plea arrangement he made with the State. Specifically, the court found that the defendant had elicited testimony from the witness about his criminal history and that the defendant cross-examined the victim extensively. Moreover, the court stated that the defendant was aware of this issue, but did not include it in his direct appeal, and thus forfeited his right to challenge the issue in the postconviction process. The court found that the claimed impeachment material of the victim was immaterial and stated that the evidence of the defendant's guilt was so overwhelming that the alleged *Brady* violation did not undermine the integrity of the trial. Finally, the court rejected the defendant's claims that his appellate counsel was ineffective and stated that the claims were meritless.

¶ 24                                    ANALYSIS

¶ 25    On appeal, the defendant raises two issues. He argues that he made a substantial showing of a *Brady* violation. The defendant argues that his postconviction petition established that the State failed to disclose its agreement with the victim in exchange for his trial testimony. He also argues that his postconviction petition made a substantial showing that he received ineffective

8

assistance of appellate counsel because counsel failed to challenge the constitutionality of his natural life sentence with no possibility of parole.

¶ 26    We begin with a brief overview of the postconviction process. An individual who has been convicted and is serving an Illinois criminal sentence can file a petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2012)) to allege that their Illinois and federal constitutional rights were denied. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). A proceeding under the Post-Conviction Hearing Act has three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418-19 (1996). In the first stage, the court must review the defendant's petition and determine if "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2012). "A post-conviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the 'gist of a constitutional claim.' " *People v. Edwards*, 197 Ill. 2d 239, 244 (2001) (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)); *Coleman*, 183 Ill. 2d at 380 n.2. The "gist" standard is a "low threshold." *Edwards*, 197 Ill. 2d at 244. A *pro se* defendant's petition must include " 'a limited amount of detail' " and does not need to include " 'legal arguments or [citations] to legal authority.' " *Id.* (quoting *Gaultney*, 174 Ill. 2d at 418). In this case, the defendant stated a gist of a constitutional claim and was advanced to the second stage. At the second stage, the postconviction court appoints an attorney to represent the defendant. 725 ILCS 5/122-4 (West 2012). The State must file an answer or file a motion to dismiss. *Id.* § 122-5. Then, the postconviction court must determine if the defendant has made a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. The postconviction court must accept all well-pleaded factual allegations as true, and the court must not engage in any fact-finding or credibility determinations. *Coleman*, 183 Ill.

9

2d at 385. The trial court must dismiss the petition if the defendant has not made the required substantial showing. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). If the defendant's petition advances to the third stage, the postconviction court will hold an evidentiary hearing. 725 ILCS 5/122-6 (West 2012).

¶ 27                                                   *Brady* Violation

¶ 28    The defendant first argues that the State withheld material information from him in violation of *Brady v. Maryland*. In *Brady v. Maryland*, the United States Supreme Court held that when the prosecution withholds evidence from the accused that is both "favorable to the accused and material to guilt or punishment," the prosecution is guilty of violating an accused's constitutional right to the due process of law. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (citing *People v. Harris*, 206 Ill. 2d 293, 311 (2002), citing *Brady*, 373 U.S. at 87). To remain compliant with *Brady*, the State must identify evidence favorable to its prosecutors as well as known to other government actors. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). In *Strickler v. Greene*, 527 U.S. 263, 281 (1999), the United States Supreme Court noted the "special role played by the American prosecutor in the search for truth in criminal trials," and that the goal in a prosecution is not to win the case, but to ensure that " 'justice shall be done' " (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

¶ 29    For the accused to establish that the State violated *Brady*, he or she must show: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *Beaman*, 229 Ill. 2d at 73-74 (citing *People v. Burt*, 205 Ill. 2d 28, 47 (2001), citing *Strickler*, 527 U.S. at 281-82).

10

"Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74 (citing *Harris*, 206 Ill. 2d at 311, citing *Kyles*, 514 U.S. at 434). Further, "[m]ateriality is demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Coleman*, 183 Ill. 2d at 393 (quoting *Kyles*, 514 U.S. at 435). Additionally, in determining whether the evidence is material, courts must look to the cumulative effect of the evidence that was withheld rather than considering the evidentiary items individually. *Beaman*, 229 Ill. 2d at 74 (citing *People v. Hobley*, 182 Ill. 2d 404, 435 (1998), citing *Kyles*, 514 U.S. at 436-41). If any court of review determines that the State committed a *Brady* violation, the constitutional error cannot be classified as harmless. *Id.* (citing *Coleman*, 183 Ill. 2d at 393, quoting *Kyles*, 514 U.S. at 436).

¶ 30    In this case, the defendant claims that the State committed a *Brady* violation because the State failed to disclose information about its deal with the victim in exchange for his testimony at trial. The State had purportedly agreed not to file a petition to revoke the victim's probation in exchange for his testimony. The defendant also alleges that the victim perjured himself and the State allowed this false testimony. The defendant states that he discovered this evidence after he was convicted.

¶ 31    In response, the State argues that the defendant's claim is forfeited because he was provided with the information he claims was withheld, did not act upon that evidence, and failed to raise the issue on direct appeal. The State also claims that the defendant's claim is refuted by the record. The defendant attached an affidavit of an inmate, Nigel Generally, to his amended petition. Generally claims that five years earlier, he had a conversation with the victim. During this

11

conversation, the victim purportedly stated that he only agreed to testify at the defendant's trial because the State offered him a deal regarding his probationary status. The State claims that Generally's affidavit is contradicted by the victim's sworn testimony at trial. In addition, the State points to the fact that the victim's testimony about the events of the evening and the crime matched his statement to police immediately following the crime. The State contends that Generally's affidavit should not be construed to contain well-pleaded facts for both reasons.

¶ 32    Before trial, the State provided the defendant with the criminal histories of the witnesses. On August 31, 2010, the State filed its discovery with the court. The discovery was the criminal history of all witnesses that the State expected to call to testify at trial. Then, on October 19, 2010, the State filed its supplemental discovery that included additional criminal histories of anticipated witnesses. We know that the defendant received the victim's criminal history because he attached that history to his affidavit that accompanied his November 18, 2013, petition for postconviction relief. We find that the defendant was fully informed of the criminal histories and the trial transcript supports his cross-examination of the victim pursuant to that history.

¶ 33    However, the criminal histories are not the critical aspect of the defendant's *Brady* violation claim. Instead, the defendant argues that the State opted not to revoke the victim's probation in exchange for his trial testimony. The *Brady* violation stems from the State's failure to inform the defendant about this alleged agreement with the victim. In testifying at trial, the victim denied that there was any such agreement or that there was a current pending petition to revoke his probation. The defendant also argues that these denials by the victim amounted to perjury and that because the State did not correct these false statements, the State's conduct further supports this claimed *Brady* violation.

12

¶ 34    On October 14, 2010, the defendant filed his *pro se* motion asking the State to disclose exculpatory information "with respect to any witnesses that the State intends to call as witnesses as trial." Specifically, he asked the State to provide him with any "promise of lenience to any witness in exchange for the witness's testimony" and any previous convictions of the witnesses. Nothing in the State's list of supplemental discovery items refers to a negotiated deal with the victim to secure his trial testimony.

¶ 35    Having reviewed the briefs of the parties and the record on appeal, we find that there is no proof that the State had a deal with the victim in exchange for his testimony at trial. The defendant theorizes that the State opted not to revoke the victim's probation. He further argues that the State was aware that the victim was arrested in July 2010 in Texas and charged with felony marijuana possession. While the State would likely have had the right to petition to revoke the victim's probation because of the Texas felony charge, the defendant asks the appellate court to make the logical leap that the State did not file the petition to obtain the victim's favorable trial testimony. We are not willing to make that finding based solely upon the defendant's argument. The record on appeal contains no support for the alleged testimony deal. We will address the matter of the affidavit of the inmate, Nigel Generally, later in this discussion.

¶ 36    We are also not convinced that the victim's testimony at trial about his probation status was perjured testimony. While the defendant argues that the victim perjured himself by testifying that there was no current petition to revoke his probation, the defendant has failed to establish the falsity of the statement. The victim testified that there had been a petition to revoke filed, but after appearing in court, the matter was resolved. The defendant provides no supportive documentation for his claim that the victim testified falsely.

13

¶ 37 We find that this case is distinguishable from *People v. Jimerson*, a case relied upon by the defendant. In *People v. Jimerson*, 166 Ill. 2d 211, 226-28 (1995), the supreme court found that the State's failure to correct the false testimony of a witness about a plea deal in exchange for her testimony against the defendant required a reversal of the conviction. The State admitted to the plea deal in exchange for the witness's testimony on three separate occasions in its brief on direct appeal. *Id.* at 226. The State also provided information about this plea deal in its discovery responses in a codefendant's case, noting that the State would drop the murder charge against the witness in exchange for her testimony against that defendant and other defendants. *Id.* Further, the State prosecutor informed the trial court in this companion case that these discovery responses applied to the defendant's case. *Id.* In addition, after the defendant's case, the State followed through on the plea deal with the witness. The court found substantial support in the outcome of the witness's case after she testified against the defendant. The State dropped a rape charge and two murder charges against the witness who was then awaiting retrial for two counts of murder, rape, and perjury (earlier convictions were reversed due to an attorney conflict of interest). *Id.* at 227. Accordingly, the court found that utilizing a commonsense view of this evidence, the witness's denials of a plea deal with the State were false. *Id.*

¶ 38 In this case, the only "proof" that there was a deal with the victim in exchange for his testimony came from an inmate's affidavit in which the inmate recounted a five-year-old conversation with the victim in which the victim admitted that there was a deal. Even if we accept the unsubstantiated affidavit of Nigel Generally, a convicted murderer, as being the truth that the State made a deal with the victim, we find that there is insufficient evidence that the suppressed evidence was both favorable to the defendant and material in nature. *Hobley*, 182 Ill. 2d at 432. In

14

this context, favorable evidence is material " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The term "reasonable probability" is defined as a " 'probability sufficient to undermine confidence in the outcome.' " *Id.* at 433 (quoting *Bagley*, 473 U.S. at 682). Materiality is shown when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

¶ 39    We find that the defendant is unable to establish that the "evidence" of the victim's alleged plea deal is material and that confidence in his guilty verdict is undermined. *Id.* The evidence of this claimed plea deal would need to be material to establish a *Brady* violation. *People v. Barrow*, 195 Ill. 2d 506, 537 (2001). Assuming that the plea deal was genuine, evidence that he was facing the revocation of his probation would have been cumulative of the victim's trial testimony that he had other felony convictions, that he sold drugs, that he was still on probation on the date of the crime for selling a large amount of marijuana, and that he was in violation of his probation on that same date for having a gun in his home.

¶ 40    Further, we note that the defendant does not dispute that he was in the victim's home on the night of the crime. The defendant does not dispute that he fought with the victim and suffered a knife and gunshot wound. The victim's testimony at trial was consistent with the statement he gave the police on the night of the crime. The other adults in the home that night all testified that a masked intruder broke into the victim's home and displayed his gun. Finally, the mask found at the scene contained the defendant's DNA. *Id.* Given the evidence presented to the jury, we do not find that the alleged plea deal evidence would have resulted in a different verdict.

15

¶ 41    We also find that even if the victim testified favorably for the State because of a belief that the Texas felony could impact his Illinois probationary status, the defendant was not prejudiced because the victim was thoroughly impeached during trial. The jury heard the victim testify that he was a convicted felon. Although he only testified that he had at least two felony convictions, the victim indicated that he did not know the actual number. He admitted that he had been convicted of manufacturing and delivering a large amount of marijuana. The victim acknowledged that he had a history of selling marijuana. He further testified that at the time of his testimony, he was on probation for the marijuana production and delivery conviction. He stated that there had been a petition seeking to revoke that probation, but that he had gone to court and the petition had been resolved. He also admitted that he was in violation of his probation on the night of the incident because he had a gun in his house.

¶ 42    Given the nature and extent of the victim's testimony about his criminal activities and convictions, the defendant's theory that the victim committed perjury is insufficient to undermine confidence in the verdict. *Kyles*, 514 U.S. at 435. We conclude that the alleged perjured testimony was not material, that the defendant was not prejudiced, and that the defendant is unable to substantially show a *Brady* violation.

¶ 43                              Ineffective Assistance of Appellate Counsel

¶ 44    The defendant also argues that he received ineffective assistance of appellate counsel because appellate counsel did not argue that the defendant was improperly sentenced as a habitual criminal. Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We presume that defense attorneys pursue sound trial strategies. See *id.* at 689. Trial strategies are

16

unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997).

¶ 45    To prevail on an ineffective-assistance-of-counsel claim, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Lefler*, 294 Ill. App. 3d 305, 311 (1998) (citing *Strickland*, 466 U.S. at 694). The term "reasonable probability" has been defined to mean "a probability sufficient to undermine confidence in trial's outcome." *Id.* at 311-12 (citing *Strickland*, 466 U.S. at 687). The fact that professional errors have been committed does not define the question. We must examine the issue from the perspective of whether the defendant received a fair trial, despite an attorney's shortcomings. *Id.* at 312. In that context, a fair trial means "a trial resulting in a verdict worthy of confidence." *Id.* (citing *People v. Moore*, 279 Ill. App. 3d 152 (1996)).

¶ 46    In this case, the defendant's claim that his appellate counsel was ineffective is based on one omission—the failure to challenge the constitutionality of the defendant's sentence as a habitual offender. 730 ILCS 5/5-4.5-95(a)(1) (West 2008). The defendant argues that the use of his 1981 armed robbery conviction to support a natural life sentence as a habitual offender violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution as applied to him. He supports this argument with United States Supreme Court case law and scientific research on brain development that suggests that penal consequences for youthful offenders should be different than for adults. U.S. Const., amends. VIII, XIV; Ill. Const. 1970, art. I, § 11; *People v. Miller*, 202 Ill. 2d 328, 340-43 (2002); *Roper v. Simmons*, 543 U.S. 551, 560 (2005); *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S.

17

460, 479 (2012). Simply stated, the defendant contends that a life sentence without any potential for release, based in part on a crime committed when he was under the age of 18, is cruel, degrading, and grossly disproportionate. *Id.*; *Solem v. Helm*, 463 U.S. 277, 284 (1983).

¶ 47    Before we begin our analysis of the Habitual Criminal Act (Habitual Criminal Act or Act) and whether appellate counsel provided ineffective assistance, we briefly review the crimes that resulted in application of the Act.  In 1981, the defendant was convicted of the first felony—armed robbery. He was then 15 years of age. He served six years in the Illinois Department of Corrections (IDOC). In 1988, the defendant was convicted of the second felony—armed robbery, attempt murder, and two counts of aggravated burglary. He was then 23 years of age. He served 20 years in the IDOC. In the next year, 2009, the defendant committed home invasion—his third felony. He was then 44 years of age.

¶ 48    The defendant acknowledges that the Illinois Supreme Court has determined that the habitual criminal statute is constitutional. *People v. Dunigan*, 165 Ill. 2d 235, 243 (1995). The appellate court has found that imposing a natural life sentence pursuant to the habitual criminal statute based on a prior Class X juvenile conviction does not constitute a double enhancement or a violation of the separation of powers clause of the Illinois Constitution. *People v. Banks*, 212 Ill. App. 3d 105, 109 (1991); *People v. Bryant*, 278 Ill. App. 3d 578, 586-87 (1996). Despite the precedent on the issue, the defendant argues that this is erroneous because "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham*, 560 U.S. at 76.

¶ 49    In response, the State contends that the defendant's argument that appellate counsel was ineffective fails for three reasons.

18

¶ 50    The first basis is that the defendant failed to raise this claim about appellate counsel's failure in his postconviction petition. Instead of arguing that his brain was not fully developed when he committed the juvenile armed robbery, he asserted that his sentencing counsel—not appellate counsel—was ineffective because he did not argue that the defendant's first conviction was void because there was no juvenile hearing before he was transferred to adult court and tried as an adult. He argued that without that void conviction, he would be ineligible as a habitual offender.[1] The trial court ruled against the defendant on this argument. The defendant does not raise this issue on appeal and instead argues that appellate counsel provided ineffective assistance by failing to challenge the constitutionality of his natural life sentence because the first crime was committed when he was 15 and he had an "underdeveloped sense of responsibility." *Roper*, 543 U.S. at 569. Any issues that a defendant wants reviewed on appeal must first be presented to the trial court in his or her postconviction petition. *People v. Jones*, 211 Ill. 2d 140, 148 (2004). The reviewing court may not excuse the defendant's failure to include the issues in the postconviction

---

[1]The defendant's argument is not fully supported with the record on appeal. Chapter 37, paragraph 702-7(3) of the Juvenile Court Act provided: "If a petition alleges commission by a minor 13 years of age or over of an act which constitutes a crime under the laws of this State, and, on motion of the State's Attorney, a Juvenile Judge, designated by the Chief Judge of the Circuit to hear and determines such motions, after investigation and hearing but before commencement of the adjudicatory hearing, finds that it is not in the best interests of the minor or of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws." Ill. Rev. Stat. 1979, ch. 37, ¶ 702-7(3). In the defendant's amended postconviction petition, he alleges that the then Madison County State's Attorney bypassed the juvenile court and filed the information in the criminal court. The defendant attached an uncertified copy of the criminal information filed in April 1981 to his amended postconviction petition. However, we note that the record on appeal does not contain the full and complete 1981 criminal record including copies of all hearing transcripts. Without that information, we have no way to determine if the Madison County circuit court held the requisite hearing. Furthermore, a defendant who fails to timely assert his rights to a juvenile proceeding waives any objection to proceeding in criminal court. *People v. Arnold*, 323 Ill. App. 3d 102, 106-08 (2001). In addition, "[w]hether a defendant is tried in juvenile or criminal court is purely a matter of procedure." *People v. Patterson*, 2014 IL 115102, ¶ 104.

petition. *People v. Jones*, 213 Ill. 2d 498, 508 (2004). We find that the defendant's failure to raise this issue in the postconviction proceeding precludes this court from considering the issue. *Id.*

¶ 51     In its second basis, the State argues that the defendant forfeited his constitutional as-applied challenge to the State's use of his juvenile felony conviction for sentencing pursuant to the Habitual Criminal Act. He did not raise the issue in the trial court, and thus the record was not developed. An as-applied constitutional challenge is dependent on specific factual circumstances about the defendant. *People v. Thompson*, 2015 IL 118151, ¶ 37. "Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* The Illinois Supreme Court has advised that "[t]his court has long held that in order to support a claim of error on appeal the appellant has the burden to present a sufficiently complete record." *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001). If the record contains no evidentiary hearing or findings of fact, a court is not able to determine if there has been an as-applied constitutional deprivation. *People v. Rizzo*, 2016 IL 118599, ¶ 26. Without an underlying evidentiary record, a finding by this court that the statutory application was unconstitutional is premature. *Id.* We agree with the State that the record has not been developed and we cannot make presumptions about what the evidence would have been.

¶ 52     Finally for its third basis, the State points to this court's decision in *People v. Lawson*, 2015 IL App (1st) 120751, in which the defendant argued that the habitual criminal sentencing provision should not apply to him because one of the qualifying convictions occurred when he was 17. *Id.* ¶ 2. In *Lawson*, the defendant argued that the natural life sentence he received constituted punishment too severe for the conduct committed as a juvenile. *Id.* The defendant argued that his natural life sentence violated the eighth amendment of the United States Constitution and the

proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 48. This court rejected the defendant's argument and held that his sentence was "not merely the result of criminal conduct he committed *** when he was 17 years old but, rather, results from his third Class X felony conviction, which occurred within 20 years of his first Class X felony conviction and long after he had reached adulthood." *Id.* ¶ 50. We concluded that the natural life sentence was constitutional because his adjudication as a habitual offender served to punish him for the separate crime he committed in adulthood. *Id.* ¶ 53.

¶ 53     The analysis provided in *Lawson* was on point. The punishment is not tied to the juvenile felony conviction, but the juvenile conviction and the second felony conviction are used as aggravating factors to support the natural life sentence for the third serious offense. *People v. Franzen*, 183 Ill. App. 3d 1051, 1059-60 (1989). Focus on the juvenile crime in isolation misses the reasoning of the legislature in enacting the Habitual Criminal Act—to protect the public from a recidivist criminal. *Id.* The Act provides a procedural process by which a defendant who is found guilty of a crime can be punished more severely because of the history of criminal convictions. *Dunigan*, 165 Ill. 2d at 242. The punishment imposed pursuant to the Act is for the most recent offense only. *Id.* The punishment is not designed to repunish the defendant for the previous felony convictions, but those earlier convictions do serve to enhance the penalty imposed for the third felony conviction. *Id.*

¶ 54     The Habitual Criminal Act provides:

"Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now (the date of the offense committed after the 2 prior convictions) classified in Illinois as a Class X felony, criminal sexual assault, aggravated kidnapping, or first degree murder, and who is thereafter convicted of a Class X felony, criminal sexual assault, or first degree murder, committed after the 2 prior

21

convictions, shall be adjudged an habitual criminal." 730 ILCS 5/5-4.5-95(a)(1) (West 2008).

Further, the Habitual Criminal Act mandates that the defendant must commit the third offense after July 3, 1980, and within 20 years of the first conviction, excluding time spent in prison. *Id.* § 5-4.5-95(a)(4)(A), (B). "[A]nyone adjudged an habitual criminal shall be sentenced to a term of natural life imprisonment." *Id.* § 5-4.5-95(a)(5).

¶ 55       In this case, the defendant committed armed robbery, a Class X felony, in 1981 as a 15-year-old juvenile. Twelve years later, in 1993, the defendant committed armed robbery and attempt murder, both Class X felonies. Finally in 2009, the defendant committed home invasion, his third Class X felony. Factually, there is no dispute that excluding the time that the defendant spent incarcerated, the defendant's three Class X convictions fit within the 20-year rule of the Habitual Criminal Act. *Id.* § 5-4.5-95(a)(4)(B). This court has already concluded that the structure of the Habitual Criminal Act is constitutional in cases where at least one of the three Class X felonies was committed when the defendant was a juvenile. *Lawson*, 2015 IL App (1st) 120751, ¶ 53. Accordingly, because the statutory acts in question are constitutional, the defendant's appellate counsel was not ineffective for failing to challenge the constitutionality of his sentence of life without the possibility of parole. See *Faulkner*, 292 Ill. App. 3d at 394.

¶ 56                                  CONCLUSION

¶ 57       For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 58       Affirmed.

22