NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240155-U

NO. 4-24-0155

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Rock Island County |
| IGNACIO A. SAGUILAN, | ) | No. 06CF333 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Clayton R Lee, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the trial court's dismissal of defendant's postconviction petition at the second stage of postconviction proceedings because defendant failed to make a substantial showing of a due process violation.

¶ 2   In February 2007, a jury found defendant, Ignacio A. Saguilan, guilty of possession with intent to deliver more than 900 grams of cocaine (720 ILCS 570/401(a)(2)(D) (West 2006)) and criminal drug conspiracy (*id.* § 405.1(a)). At trial, the State presented a series of recorded phone calls between defendant and Maribel Cortes, who had agreed with law enforcement officials to record those calls, arranging for the sale of cocaine to an undercover agent posing as a buyer secured by Cortes. The State also presented evidence that defendant arrived at the meeting place and was arrested with four kilograms of cocaine in his car. Cortes and three law enforcement officials testified that Cortes had received nothing in exchange for her cooperation.

¶ 3        In May 2007, the trial court sentenced defendant to 45 years in prison for each count, to be served concurrently. In December 2009, defendant filed a postconviction petition that ultimately resulted in his sentence being reduced to 40 years and his conviction for criminal drug conspiracy being vacated.

¶ 4        In February 2015, defendant filed a petition pursuant to section 2-1401 of the Code of Civil Procedure (Procedure Code) (735 ILCS 5/2-1401 (West 2014)), which the trial court construed as a postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), and in September 2022, defendant filed an amended postconviction petition, which is the subject of this appeal. In that amended petition, defendant alleged that while in prison reviewing his trial documents, he discovered a statement by Jose Lao, a special agent with the Illinois State Police, to Cortes at the end of one of the recordings in which Lao referenced Cortes receiving "credit" for her husband, Rigoberto Corrales, who was incarcerated in federal prison and received a sentence reduction several months after defendant's own sentencing hearing. Defendant asserted, therefore, that his due process rights were violated because the State (1) concealed the existence of a cooperation agreement between Cortes and law enforcement and (2) allowed witnesses to testify falsely that no such agreement existed.

¶ 5        In May 2023, the State filed a motion to dismiss the petition, which the trial court granted following a hearing in December 2023.

¶ 6        Defendant appeals, arguing that the trial court erred by dismissing his amended successive postconviction petition because (1) the Act does not authorize untimeliness as a basis for dismissing a successive petition, (2) defendant demonstrated cause and prejudice for the filing of his successive petition, and (3) defendant made a substantial showing that the State violated his due process rights by (a) failing to disclose the existence of a cooperation agreement

between law enforcement and Cortes and (b) eliciting false testimony about the absence of such an agreement at trial. Defendant also argues on appeal that his postconviction counsel provided unreasonable assistance by failing to amend defendant's postconviction petition to allege that trial counsel provided ineffective assistance by failing to use Lao's "credit" statement at trial to impeach prosecution witnesses.

¶ 7        We disagree and affirm.

¶ 8                          I. BACKGROUND

¶ 9                    A. The Charges and the Jury Trial

¶ 10        In April 2006, the State charged defendant with possession with intent to deliver more than 900 grams of cocaine (count I) (720 ILCS 570/401(a)(2)(D) (West 2006)) and criminal drug conspiracy (count II) (*id.* § 405.1(a)). Both counts were Class X felonies carrying mandatory prison sentences of 15 to 60 years.

¶ 11        In February 2007, the trial court conducted defendant's jury trial. The State presented evidence that in February 2006, defendant became the target of a joint drug investigation between the Drug Enforcement Agency (DEA) and Quad City Metropolitan Enforcement Group (MEG) after Cortes came forward with information about defendant. Cortes testified that she knew defendant through Corrales, who was in federal prison following a 2005 arrest in Nevada. Defendant had been arrested with Corrales, but only Corrales was charged. Cortes stated that in early 2006, defendant called her and asked her to work with him to sell cocaine. She told her husband, who advised her to call the DEA. As a result, Cortes agreed to work with law enforcement to record her phone calls with defendant. Cortes testified that she came forward as a "concerned citizen" and did not receive anything in exchange for her cooperation.

¶ 12        Special Agent Jose Lao, who was employed by the Illinois State Police and was a member of MEG, testified that he posed as an undercover buyer that Cortes would introduce to defendant to purchase four kilograms of cocaine for $80,000. Lao worked with Cortes to record approximately 17 phone calls with defendant occurring on March 5, March 6, and April 11, 2006. Lao was with Cortes when each phone call occurred. During those phone calls, which were played for the jury and which we discuss in more detail in our analysis, Cortes and defendant discussed a "guy" coming into town and arranged to meet at a hotel. Defendant arrived at the hotel and was found to have four kilograms of cocaine in his car.

¶ 13        After the State rested, defendant elected not to testify and offered no evidence.

¶ 14        The jury found defendant guilty of both possession with intent to deliver cocaine and criminal drug conspiracy, and in May 2007, the trial court sentenced defendant to concurrent terms of 45 years in prison on each count. In June 2008, this court denied defendant's request to file a late notice of appeal and his direct appeal was dismissed.

¶ 15                        B. Posttrial Proceedings

¶ 16                1. *Defendant's Initial Postconviction Petition*

¶ 17        In December 2009, defendant filed a petition for relief under the Act, alleging that his trial counsel rendered ineffective assistance by (1) erroneously advising him that he faced a maximum of 30 years in prison when he actually faced 60 years in prison and (2) failing to file a timely motion to reconsider sentence and notice of appeal. In June 2010, following a hearing, the trial court denied defendant's first claim but found that trial counsel was ineffective by failing to file a timely notice of appeal and allowed defendant to file his notice of appeal and motion to reconsider his sentence.

¶ 18        In July 2010, defendant filed a motion to reconsider his sentence and notice of

appeal from the partial denial of his postconviction petition. In August 2010, the trial court conducted a hearing on his motion to reconsider and reduced his sentence to 40 years in prison.

¶ 19        Later in August 2010, defendant filed notice of direct appeal of his conviction and sentence. In 2012, the Third District Appellate Court vacated defendant's conviction for criminal drug conspiracy pursuant to the one-act, one-crime doctrine but affirmed his conviction and sentence for possession with intent to deliver more than 900 grams of cocaine. *People v. Saguilan*, 2012 IL App (3d) 100562-U, ¶ 21.

¶ 20                    2. *Defendant's Successive Postconviction Petition*

¶ 21                        a. The Allegations in the Petition

¶ 22        In February 2015, defendant filed a petition pursuant to section 2-1401 of the Procedure Code (735 ILCS 5/2-1401 (West 2014)), in which he alternatively asked that the trial court construe his petition as a motion for leave to file a successive postconviction petition and a successive petition under the Act. Defendant requested a new trial, alleging "(1) newly-discovered evidence of concealed benefits to the principal witness or witnesses for the prosecution; and (2) the related, knowing use of perjury at defendant's jury trial in order to mislead defendant's jury."

¶ 23        Essentially, defendant alleged that Cortes and law enforcement agents testified falsely at trial that Cortes had not been promised any consideration in exchange for her testimony. Defendant attached to his petition a police report that transcribed the recordings of the phone calls. According to the transcription, after one of the April 11, 2006, phone calls between Cortes and defendant ended, Cortes and Lao continued speaking while the recording device was still recording. Cortes asked Lao, "[What] if nothing happens?" Lao replied, "Well, we'll let him go and we'll try to catch him a different way but okay, but for this to work, we are close but if

you want to try to give credit to [Corrales], let['s] do it today and we have to do [it] at this hotel."

¶ 24    Defendant asserted that he did not read or write English and became aware of this statement by Lao only when he was in prison sometime in 2013, when he "obtained some of his trial transcripts and discovery materials" and another inmate translated all of defendant's discovery for him. He contended that his trial counsel may not have been aware of the statement on the recording because he never discussed it with defendant or cross-examined any of the witnesses about it.

¶ 25    Defendant explained that he thereafter obtained counsel to investigate "whether there could be any explanation, for the statement *** concerning 'credit' for *** [Corrales]," and counsel discovered that (1) in January 2006, Corrales was sentenced to 240 months in federal prison, (2) in June 2007, a " 'sealed motion' " (emphasis omitted) was filed in Corrales's federal case, and (3) in February 2008, following a hearing, the federal court granted the sealed motion and reduced Corrales's sentence to 190 months.

¶ 26    Defendant contended that the "likely meaning of the word 'credit' " referred to an agreement to reduce Corrales's sentence, which was not disclosed to defendant and was not "uncovered" until defendant learned of Corrales's sentence reduction. As a result, according to defendant, witnesses for the State who had testified that no agreement existed had testified untruthfully, and this merited a new trial.

¶ 27                            b. Procedural Matters

¶ 28    In April 2015, the trial court entered a written order construing defendant's section 2-1401 petition as a postconviction petition and docketing it for further proceedings under the Act.

¶ 29    In November 2015, defendant's posttrial counsel, Dennis Doherty, moved to

withdraw as counsel, alleging he had been "fired" by defendant. That same month, the trial court entered a written order granting Doherty's motion to withdraw and also finding, "On motion of defendant's counsel the pending post-conviction pleadings are withdrawn, without prejudice." (Emphasis omitted.)

¶ 30	In January 2016, defendant *pro se* filed a new petition pursuant to the Act alleging, among other things, that "[Cortes] and the state deliberately and indifferently committed 'subordination [*sic*] of perjury' where the state induced another to commit perjury where *** [Cortes] deliberately and knowingly lied when asked if she received any payment or was promised anything for her cooperation and she replied, 'No.' " Defendant attached to his petition the same police report containing the transcription of Lao's "credit" statement to Cortes that had been attached to his withdrawn petition.

¶ 31	In March 2016, the trial court appointed new counsel to represent defendant concerning his postconviction petition. In June 2019, that counsel, Nate Nieman, moved to withdraw, and the court granted his request, appointing a new attorney, Matthew Paulson, to represent defendant in his postconviction proceedings.

¶ 32	c. The Amended Petition and the State's Motion To Dismiss

¶ 33	In September 2022, defendant, through counsel, filed an "Amended Petition for Post-Conviction Relief Pursuant to 725 ILCS 5/122-1," which is the subject of this appeal. Under a heading titled "Timeliness of Petition," defendant cited both (1) section 122-1(c) of the Act (725 ILCS 5/122-1(c) (West 2022)), which provides that initial petitions under the Act must be filed within six months from the date for filing a *certiorari* petition unless the petitioner shows that the delay was not due to his culpable negligence, and (2) *People v. Ortiz*, 235 Ill. 2d 319 (2009), and *People v. Morgan*, 212 Ill. 2d 148 (2004), for the proposition that a successive

postconviction petition may be filed upon a showing of good cause for failing to raise the error earlier and actual prejudice resulting from the error.

¶ 34    Defendant's amended petition "incorporate[d] all previously filed evidence, affidavits, exhibits and arguments regarding post-trial relief" and generally repeated the arguments that had been set forth in his earlier petition. Defendant asserted that his due process rights were violated because the State concealed an agreement with Cortes to cooperate with law enforcement in exchange for a reduced sentence for her husband. Defendant also alleged that he had established cause and prejudice for the filing of a successive petition.

¶ 35    In May 2023, the State filed a motion to dismiss the amended petition arguing (1) the petition was not timely because it was not filed within six months after his March 2012 resentencing and (2) the evidence defendant relied upon was not "newly discovered" because the transcript of the conversation during which Lao mentioned "credit" was in defendant's possession at the time of his trial. As a result, the State asserted, the petition was "not timely filed, and *** no excuse exists in this case to expand or relax such filing requirement."

¶ 36    Later that same month, defendant filed a response to the State's motion to dismiss, conceding that under the Act, "no proceedings *** shall be commenced more than 6 months from the date for filing a *certiorari* petition, unless the petitioner alleges facts that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2022). Defendant asserted, however, that he had alleged facts showing no culpable negligence— namely, that he could only speak and understand Spanish and was aware of the "perjured and misleading testimony offered by [Cortes] and law enforcement that demonstrated the high likelihood that Cortes received a benefit [of a five year sentence reduction for her husband as a result of] her cooperation with the government" only after other inmates translated his discovery

materials for him in prison.

¶ 37                                          d. The Trial Court's Order

¶ 38          In September 2023, the trial court conducted a hearing on the State's motion to dismiss and, in December 2023, issued a written ruling dismissing defendant's amended petition. The court found that the petition was not timely filed and defendant had not shown a lack of culpable negligence for filing outside of the six-month time frame. The court explained its ruling as follows:

> "The defendant claims lack of culpable negligence as he cannot read or write, and can only speak Spanish. He claims it also took him some time to secure transcripts in this case, and found out about the benefits offered [Cortes] for her testimony only after a subsequent investigation by post-trial counsel.
>
> *** The defendant admits himself in the Amended Post-Conviction Petition that such evidence was in defendant's possession at trial. It's referenced in paragraph 15(b)(ii) in the defendant's amended Post-Conviction Petition. It appears the defendant and his counsel had recordings in Spanish, and transcripts which show potential credit for the witnesses' cooperation. The Court doesn't know if it was trial strategy, or if it was overlooked, but it's clear defendant and counsel had the relevant information.
>
> The Court, knowing the defendant and his counsel were aware of the information as alleged in their own Post-Conviction Petition, therefore FINDS that there is culpable negligence by the defendant in this case, and the culpable negligence precludes any extension of the six-month filing period for the post-conviction [petition]."

¶ 39        This appeal followed.

¶ 40                                II. ANALYSIS

¶ 41        Defendant appeals, arguing that the trial court erred by dismissing his amended successive postconviction petition because (1) the Act does not authorize untimeliness as a basis for dismissing a successive petition, (2) defendant demonstrated cause and prejudice for the filing of his successive petition, and (3) defendant made a substantial showing that the State violated his due process rights by (a) failing to disclose the existence of a cooperation agreement between law enforcement and Cortes and (b) eliciting false testimony about the absence of such an agreement at trial. Defendant also argues on appeal that his postconviction counsel provided unreasonable assistance by failing to amend defendant's postconviction petition to allege that trial counsel provided ineffective assistance by failing to use Lao's "credit" statement at trial to impeach prosecution witnesses.

¶ 42        We disagree and affirm.

¶ 43                                A. Timeliness

¶ 44        As an initial matter, we briefly address defendant's timeliness argument. As we have noted, the trial court found that defendant's petition was filed outside of the six-month time limit set forth in section 122-1(c) of the Act and defendant had not shown that the delay was not due to his own culpable negligence. See 725 ILCS 5/122-1(c) (West 2022) ("No proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.").

¶ 45        On appeal, defendant asserts that because he had filed a successive petition, the time limitations of section 122-1(c) did not apply in this case. Instead, he asserts, the provisions

of section 122-1(f) applied, which allow a successive petition to be filed when the petitioner "demonstrates cause for his *** failure to bring the claim in his *** initial post-conviction proceedings and prejudice results from that failure." *Id.* § 122-1(f). Defendant contends that he did demonstrate both cause and prejudice.

¶ 46         The State responds that the trial court correctly dismissed defendant's petition pursuant to section 122-1(c) because it was an initial petition and not a successive one. The State asserts that although defendant filed an earlier petition in 2009, that petition resulted in his sentence being reduced to 40 years, meaning the petition at issue in this appeal, filed in 2016, was a new initial petition attacking that new judgment. See *People v. Jenkins*, 2016 IL App (1st) 133286, ¶ 1 ("We hold that the court should treat [a new petition filed after a postconviction petition leads to resentencing] as an initial postconviction petition.").

¶ 47         In this case, we need not determine whether defendant's amended petition was a successive petition to which the cause and prejudice test of section 122-1(f) applied or a new initial petition to which the six-month and culpable negligence provisions of section 122-1(c) applied because, as we next discuss, regardless of which test we applied, defendant has failed to make a substantial showing of a constitutional violation. That is to say, even if we agreed with defendant, his underlying claim—that his right to due process was violated by the State's knowing use of false testimony and failure to disclose an agreement with Cortes—fails on its merits.

¶ 48         B. Substantial Showing of a Due Process Violation

¶ 49             1. *Proceedings Under the Act*

¶ 50         "The [Act] (725 ILCS 5/122-1 *et seq.* (West 2018)) is the statutory procedure by which a defendant can pursue a claim that his conviction or sentence was based on a substantial

denial of his constitutional rights." *People v. Clark*, 2023 IL 127273, ¶ 38. A proceeding under the Act consists of three stages. *People v. Tate*, 2012 IL 112214, ¶ 9.

¶ 51 At the first stage, the trial court conducts its own review of the petition to determine if it states the gist of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24. "If the postconviction petition is not summarily dismissed at the first stage, the proceedings move to the second stage." *People v. House*, 2021 IL 125124, ¶ 16.

¶ 52 At the second stage of postconviction proceedings, which the present case involves, counsel may be appointed to represent the petitioner (*id.* ¶ 17), and the State is permitted to file a motion to dismiss or an answer to the petition (*People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). To avoid dismissal, a defendant must set forth in his petition a substantial showing of a constitutional violation and attach any accompanying documentation. *House*, 2021 IL 125124, ¶ 17. At this stage, the "trial court must examine the legal sufficiency of the defendant's allegations taking all well-pleaded facts as true." *People v. Lucas*, 203 Ill. 2d 410, 418 (2002). "Upon a substantial showing of a constitutional violation, the petition must be advanced to the third stage, where the [trial] court conducts an evidentiary hearing." *People v. Brown*, 2017 IL 121681, ¶ 24.

¶ 53 "A defendant is not entitled to an evidentiary hearing on his claims as a matter of right." *Lucas*, 203 Ill. 2d at 418. "Rather, a defendant is only entitled to an evidentiary hearing where the allegations contained in the petition, supported by the trial record and any accompanying affidavits, make a substantial showing of a constitutional violation." *Id.* "Upon no showing, the petition should be dismissed." *Brown*, 2017 IL 121681, ¶ 24.

¶ 54 The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*. *Id.*

¶ 55                                          2. *This Case*

¶ 56          Defendant argues that the trial court erred by failing to advance his petition for a

third-stage evidentiary hearing because the allegations in his petition make a substantial showing

of a due process violation. Specifically, defendant asserts that the State had an "undisclosed

agreement with Cortes and Corrales to benefit them through favorable treatment in Corrales's

criminal case in exchange for their cooperation in the investigation and prosecution of

defendant." Defendant contends that his right to due process was violated by (1) the State's

knowing use of false testimony by multiple witnesses that no such agreement existed and,

relatedly, (2) the State's failure to disclose the agreement.

¶ 57          We disagree that the allegations in defendant's petition, taken as true, make a

substantial showing of a due process violation.

¶ 58                            a. Knowing Use of False Testimony

¶ 59          It is well established that "[a] conviction obtained through the use of false

testimony implicates due process concerns and is subject to reversal." *Lucas*, 203 Ill. 2d at 422.

However, the mere existence of some false testimony does not automatically warrant reversal.

See *id.* "[W]here the State's case includes [false] testimony, and the State knew, a strict standard

of materiality applies, and a court of review must overturn the conviction *if there is any*

*reasonable likelihood that the false testimony could have affected the judgment of the jury*."

(Emphasis added and internal quotation marks omitted.) *Id.* "This standard is equivalent to the

harmless error standard." (Internal quotation marks omitted.) *Id.*

¶ 60          Applying these principles, the Illinois Supreme Court has held in some instances

that the presence of false testimony was not harmless (*People v. Olinger*, 176 Ill. 2d 326 (1997);

*People v. Jimerson*, 166 Ill. 2d 211 (1995)), and in other instances, it has held that the presence

of false testimony was harmless (*Lucas*, 203 Ill. 2d at 424; *People v. Barrow*, 195 Ill. 2d 506 (2001)). An examination of these cases and how they differ is helpful to our resolution of the case before us.

¶ 61          i. *False Testimony Was Not Harmless:* Olinger *and* Jimerson

¶ 62          In *Olinger*, 176 Ill. 2d at 333, the defendant was found guilty of the murders of three individuals and was sentenced to death. The defendant filed a petition for postconviction relief, alleging that the State had solicited false testimony from a witness, Edward Stalder, that he had received immunity from prosecution for a single unrelated burglary in exchange for his testimony against the defendant when, in fact, Stalder had obtained a "multijurisdictional deal" that resulted in the dismissal of several charges against him in multiple states. *Id.* at 342. The trial court dismissed the defendant's petition without affording him an evidentiary hearing. *Id.* at 333.

¶ 63          The supreme court, after "considering the particular facts and circumstances of [the] case," held that it could not "conclude that evidence that Stalder obtained a multijurisdictional deal in exchange for his testimony against [the] defendant would not have affected the jury's verdict." *Id.* at 348-49. The court noted that had the jury known of the multijurisdictional deal involving the dismissal of "several charges pending against [Stalder] in a number of jurisdictions," the jury "may well have concluded that [he] was unworthy of belief because he had an overwhelming incentive to fabricate testimony." *Id.* at 349. This incentive to fabricate was important because "Stalder's testimony was the *only* evidence placing the murder weapon in [the] defendant's hands. In addition, Stalder provided the *only* evidence which attributed a motive to [the] defendant for the killings." (Emphases in original.) *Id.* As a result, "[m]aintaining Stalder's credibility was *** crucial to the State's case against [the] defendant."

*Id.* The supreme court held that "any error in this regard may not be considered harmless" (*id.*) and remanded for an evidentiary hearing (*id.* at 371).

¶ 64    Similarly, in *Jimerson*, 166 Ill. 2d at 211, the defendant was convicted of murdering two people and was sentenced to death. He subsequently filed a postconviction petition, alleging that "the State's primary witness, Paula Gray, was allowed to testify falsely at the defendant's trial that she had not been promised anything in exchange for her testimony" when "[she] had, in fact, been promised by the State that the murder charges [against her] would be dropped if she testified against the defendant [and two codefendants]." *Id.* at 221-22. The trial court summarily dismissed the defendant's petition without an evidentiary hearing. *Id.* at 211.

¶ 65    On appeal, the State argued that the use of false testimony was harmless error. *Id.* at 228. The court rejected that argument, noting that "Paula Gray's testimony was the *only* evidence to link the defendant to these crimes" and was, therefore, "crucial to the State's case against the defendant." (Emphasis in original.) *Id.* The court also noted that Gray's first statement to the police implicated the codefendants but not the defendant, making the credibility of her trial testimony against the defendant "suspect." *Id.* at 228-29. The court held, "[B]ecause of the unique importance of Gray's testimony at the defendant's trial, we find that this error cannot be considered harmless beyond a reasonable doubt." *Id.* at 229.

¶ 66    Because the State "admitted [on appeal] that it had 'agreed' to drop the murder charges against Gray if she testified" (*id.* at 227), the court remanded the case for a new trial instead of an evidentiary hearing (*id.* at 231).

¶ 67    ii. *False Testimony Was Harmless:* Lucas *and* Barrow

¶ 68    In contrast, in *Lucas* and *Barrow*, the supreme court affirmed the dismissals of the defendants' postconviction petitions because the use of false testimony at their trials was

harmless error.

¶ 69       In *Lucas*, 203 Ill. 2d at 412, the defendant was convicted of murder and was sentenced to death. The defendant subsequently filed a postconviction petition, alleging that the State allowed witness Harry Martin to testify that "he had no cooperation agreement with the State in exchange for his testimony," when in fact, within days of the murder, investigators offered Martin various forms of consideration for his cooperation in the investigation, and Martin ultimately received significant sentence reductions in state and federal court. *Id.* at 419-21. The trial court granted the State's motion to dismiss defendant's postconviction petition without an evidentiary hearing. *Id.* at 412.

¶ 70       On appeal, the defendant argued that "similar to *Olinger* and [*People v. Steidl*, 177 Ill. 2d 239 (1997)], the State's knowing use of perjured testimony prevented the jury from assessing the witness' credibility or motive to testify falsely, such that he was prejudiced." *Id.* at 423. The supreme court disagreed, noting that, in *Olinger*, "the witness' credibility was crucial to the State's case because his testimony was the only evidence to connect the murder weapon to the defendant and the only evidence to supply motive," and in *Steidl*, "the witness who falsely testified about her cooperation agreement was the State's only direct identification witness." *Id.* The court added that the witness in *Steidl* was also crucial to the State's case because she "participated in the crime and testified about the intimate details of the murder, including [the] defendant's participation during the killing." *Id.* at 423-24.

¶ 71       In contrast to the witnesses in those cases, the *Lucas* court noted, "Martin did not offer direct identification evidence against [the] defendant and did not connect [the] defendant to the murder weapon." *Id.* at 424. "Rather, Martin testified in support of the State's motive theory and notably did not provide the only evidence of motive." *Id.*

¶ 72        Specifically, the record revealed that the defendant was an inmate at Pontiac Correctional Center when he and a codefendant murdered Robert Taylor, the superintendent of the prison. *Id.* at 413. Two other inmates gave eyewitness testimony at trial, stating the defendant beat Taylor in the head with a pipe while another inmate stabbed him. *Id.* Martin, a member of the same gang as the defendant, testified that (1) he learned the gang planned on committing a retaliatory assassination of Taylor, (2) the defendant was a member of the gang's "security group," which carried out attacks or murders against other inmates or prison staff, and (3) the defendant was present at a gang meeting during which retaliation against the prison administration was discussed. *Id.* at 415-16.

¶ 73        Considering these facts, the supreme court affirmed the trial court's dismissal of the defendant's postconviction petition without an evidentiary hearing, concluding as follows:

> "[I]n this case, we cannot equate the prejudice caused by the failure to disclose an agreement with a nonoccurrence witness with the prejudice caused by the State's failure to disclose evidence of a cooperation agreement with a direct identification witness. That is, Martin's testimony, although helpful, was not crucial to the State's case.
>
> Certainly, we do not condone the State's use of perjured testimony, and in those cases where it is proven we condemn it. The State had an obligation to correct the falsity [citation]; however, whether [the] defendant is entitled to an evidentiary hearing on his claim is a separate issue that requires us to consider whether [the] defendant has made a substantial showing of a due process violation. That is, [the] defendant is only entitled to an evidentiary hearing if there is a substantial showing of a reasonable likelihood that the false testimony could

have affected the judgment of the jury. In this case, because the record contains overwhelming evidence of guilt, in the form of two eyewitnesses who offered identification testimony, we find that [the] defendant does not make the requisite substantial showing." *Id.* at 424.

¶ 74 Likewise, in *Barrow*, 195 Ill. 2d at 511, 529, the defendant, who was also convicted of murder and sentenced to death, filed a postconviction petition alleging that "his constitutional right to due process was violated at trial because the State elicited false testimony from Harold 'Smokey' Wrona regarding what promises were made to him in exchange for his testimony against [the] defendant." At trial, Wrona testified that he did not have any agreement with Illinois authorities in exchange for his testimony (although he had an agreement with Maryland authorities that resulted in his release from prison), but the defendant alleged that Wrona in fact had an agreement with Illinois authorities for the dismissal of two felony charges in Bureau County, Illinois, which occurred three weeks after the defendant was sentenced. *Id.* at 530. The trial court dismissed the defendant's petition without an evidentiary hearing. *Id.* at 511.

¶ 75 On appeal, the supreme court affirmed the judgment of the trial court, concluding as follows:

"Even if we assume that an agreement existed and that the State failed to disclose it, the substantial nature of the evidence against the defendant establishes that there is no reasonable likelihood that the allegedly false testimony could have affected the jury's verdict in this case. [Citation.] As we have already discussed in detail, the evidence of the defendant's guilt was overwhelming. A great deal of evidence placed the defendant in the vicinity of Cedar Point during the week preceding the victim's murder. Moreover, the record contains the defendant's own

- 18 -

incriminating words describing his role in these offenses. The jury heard the recording of the defendant's conversation with Wrona in the Maryland hotel room. The defendant gave Wrona a detailed account of the crimes, providing information that only the offender could have known. The defendant told Wrona that 'everything went just like *** we had planned it.' " *Id.* at 532.

¶ 76            iii. *The Present Case Is Similar to* Lucas *and* Barrow

¶ 77       We conclude that the present case is similar to *Lucas* and *Barrow* because, even if an agreement existed with Cortes that her husband would receive a sentence reduction in exchange for her testimony, the evidence of defendant's guilt was so overwhelming that any trial testimony that Cortes did not have such an agreement could not have affected the jury's verdict.

¶ 78       (a) The Overwhelming Evidence of Defendant's Guilt

¶ 79       It cannot be overstated that defendant was arrested at the location of a controlled buy in possession of four kilograms of cocaine. Such direct evidence itself could be considered overwhelming. Aside from this physical evidence, similar to *Barrow*, defendant's guilt was premised primarily on recordings of defendant himself discussing the crime. During Agent Lao's testimony, the State played a series of phone calls for the jury, capturing defendant's own words, translated by a neutral, court-certified translator. Those phone calls unquestionably established defendant's participation in the planning of a meeting with a "guy" at a hotel for a drug transaction.

¶ 80       For instance, on March 5, 2006, Cortes told defendant that the "guy" was delayed by a snowstorm but would arrive in three hours and would get a hotel room. Defendant asked, "So he's coming?" Cortes answered affirmatively, and they agreed to talk again the following day.

¶ 81  The following day, Cortes called defendant to tell him she was with the "guy" at his hotel, she "saw it and it's ready," and they were waiting for defendant. Defendant responded that he wanted to see Cortes first so he could give her a cotton T-shirt. Specifically, defendant stated, "I want him to see it first, because maybe he'll see something that is wrong and maybe the T-shirt—the T-shirt because it's, you know, they are cotton. But I want him to see it first because…because I don't want any problems."

¶ 82  The remaining phone calls took place on April 11, 2006. Cortes told defendant she was with her "brothers" at the "house that you told us that they were renting." Defendant told Cortes, "Don't speak that in your phone because I don't know what your phone has in there." He then told her to make the phone call from "somewhere else" and "from a house phone." He emphasized, "And do not speak to me from that phone. Talk to me from another phone."

¶ 83  In the next phone call, defendant said he was going to "have to change all the phones," then asked Cortes, "So did I give you that beach shirt, T-shirt?" He also asked Cortes, "Do you remember how it's done right? Like I told you?" When Cortes answered, "Um," defendant instructed, "You just count the little puppies, and then you count them for me and you. And then you put them in a bag and you give me my puppies and you get your puppies. And I want you to count them." Cortes responded that she had already counted, and defendant asked, "You counted the ones that are ours?" Cortes answered affirmatively, and defendant stated, "So then I will call you and then we'll get together where we are going to get together and then… And it will happen in an hour and you wait for me." Cortes said, "Okay," and defendant stated, "And right now I'm going to locate him because I don't know where he's at."

¶ 84  In the next phone call, defendant stated he was having trouble locating someone and asked Cortes what time she had to go to work. When she said she had to leave before five

o'clock, defendant said, "I think we'll be ready," and, "I think it would be like three, two, or maybe."

¶ 85        In a subsequent call, defendant asked Cortes to "[g]ive me the address." Cortes answered, "12th Avenue, Street 19th," adding, "It's not a house," and, "It's at 8—Motel 8." Cortes told defendant to call her when he arrived and she would "go down." Defendant asked, "With everything ready?" Cortes answered, "Uh-huh," and defendant said, "Okay."

¶ 86        In the next phone call, occurring around 3:30 p.m., defendant told Cortes the following:

> "Mari, yes, you are not going to go to work. No. You are going to have to stay there. They are coming all over at 6:00 p.m. They are going to bring all of these pieces, the big pieces. The buy guy says to stay there and he will pay for your day not to go to work."

When Cortes explained that her job would have to look for someone to cover her shift if she told them she was not coming in, defendant said, "[T]hey are already on their way and I don't want to have to call them. They are going to be bringing twelve big things here and, you know, there's too much fucking thing [*sic*] going around." He stated, "I already gave my word and I cannot break it."

¶ 87        During the next phone call, defendant told Cortes to "[c]ount all the papers in the pinata" and said he would call her "when everything is ready."

¶ 88        During the next phone call, around 5:21 p.m., defendant told Cortes, "I am picking up the stuff right now." Cortes asked, "How long?" and defendant answered, "Fifteen minutes." He then told Cortes to come down to the parking lot when he called her.

¶ 89        No more phone calls occurred.

¶ 90        We have presented only a small portion of the phone calls to illustrate the incriminating nature of defendant's own words. Although he and Cortes did not speak in explicit terms, it is eminently clear from the entirety of the phone calls that defendant and Cortes planned a meeting at which some kind of contraband would be exchanged. In fact, Lao testified that his "role was to be the undercover and to deliver $80,000 for four kilos of powder cocaine," which is precisely what defendant eventually arrived with at the hotel. Lao additionally testified that, in his experience conducting narcotics investigations, the terms "children" and "kids" referred to U.S. currency and "white T-shirt" meant cocaine.

¶ 91        Lao testified that, after about 35 minutes passed and defendant had not shown up, they decided to "end the detail because we kept being pushed back and pushed back." Cortes left the hotel, and Lao returned the room keys to the office. When Lao was leaving the office, defendant pulled his car into the motel parking lot. Lao advised other officers that defendant had just arrived. Defendant sat in his car for "a while" and then drove a short distance away, parked his car, and began walking back in the direction of the hotel. An arrest team arrived and took defendant into custody.

¶ 92        Deputy Brian McCollom, a member of MEG, testified that he was part of the arrest team and he searched defendant's car, locating four packages of cocaine in a cooler situated on the front passenger-side floorboard. A forensic scientist testified that the packages were four bricks of cocaine, weighing a total of 3,944.4 grams—or nearly four kilograms.

¶ 93        The foregoing evidence—defendant's statements in the recorded phone calls and his arrival at the hotel with the expected four kilograms of cocaine—illustrates that overwhelming evidence of defendant's guilt exists in this case that had nothing to do with the alleged false testimony that Cortes had no agreement with the State to testify in exchange for a

benefit to her husband, which we now discuss.

¶ 94                                    (b) The Alleged False Testimony

¶ 95            During trial, the State called 12 law enforcement officers, who testified about various aspects of the investigation, including its genesis, the recording and preservation of the phone calls, defendant's arrest, and the recovery and testing of the cocaine. Defendant asserts that three of them—namely, Agent Russ Coulter, Deputy Jeffrey Boyd, and Deputy Gina Lieferman—and Cortes all "denied the existence of an agreement or that Cortes and Corrales were to receive a benefit in exchange for cooperating with law enforcement." We discuss their testimony in turn.

¶ 96                                    (i) *Agent Coulter*

¶ 97            Agent Coulter of the DEA testified primarily about how the investigation into defendant began, the structure of MEG, and the obtaining of federal eavesdrop authority to record defendant's phone calls. He stated that Cortes was a confidential source who worked with law enforcement and Cortes "came to our attention after Mr. Corrales agreed to cooperate after he was arrested." Coulter explained that "[Corrales] was detained so he couldn't do anything to help himself and Ms. Cortes came forward on his behalf to assist in any investigations that she could."

¶ 98            On recross-examination, Coulter testified that Cortes "wanted to help because her husband was in trouble." On further redirect examination by the State, Coulter testified that Corrales had participated in a "proffer interview" in March 2005, explaining that, in the federal system, when "an individual becomes charged *** [and] wants to cooperate, [he] enters into a proffer agreement with the U.S. Attorney's Office or with the State's Attorney's Office." Corrales's proffer interview resulted in Coulter's generating a five-page written report.

- 23 -

¶ 99       Coulter also testified that he did not promise Cortes anything when she agreed to cooperate and Cortes wanted to help her husband, not get paid.

¶ 100                          (ii) *Deputy Boyd*

¶ 101       Deputy Boyd of the Rock Island County Sheriff's Office, who was also the deputy director of MEG, testified that defendant came to his attention in late February or early March 2006, when one of his supervisors working on Corrales's federal investigation alerted him that Cortes had come forward with information about defendant. Boyd first had contact with defendant following his arrest in this case, when Boyd and another agent, Tina Noe, drove defendant to the police station. Boyd, who did not speak Spanish, attempted to Mirandize defendant (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). When defendant asked to be Mirandized in Spanish, Boyd stopped and asked for a Spanish-speaking officer to meet them at the department. Deputy Lieferman, who spoke Spanish, Mirandized defendant. Then Agent Lao, who also spoke Spanish, translated Boyd's interview of defendant. During that interview, defendant generally claimed that someone named "Jorge" offered him $1,500 to deliver a package; defendant stated that he did not know what was in the package.

¶ 102       During his testimony, Boyd stated that Cortes did not ask to be paid or that her husband be treated differently, and "there were no arrangements or deals made with her."

¶ 103                          (iii) *Deputy Lieferman*

¶ 104       Deputy Lieferman testified that she first met Cortes in early 2005, after Cortes contacted one of the federal agents. Around that time, Lieferman participated in a meeting with Cortes, Deputy Boyd, and Special Agent Mark VanKlaveren. Lieferman was also present "a couple other times" when Agent Lao spoke with Cortes. Lieferman read defendant his Miranda warnings in Spanish after he was arrested. Her role in the case was primarily to conduct

surveillance.

¶ 105     During her testimony, Lieferman stated Cortes did not receive anything in return for helping with the investigation.

¶ 106                              (iv) *Cortes*

¶ 107     Cortes testified that she knew defendant through her husband. After her husband was arrested in 2005, she did not maintain contact with defendant, but he contacted her about a year later and asked her to work with him by selling cocaine. She spoke with her husband, who was in prison, and he suggested she speak "with the agents and tell them what was happening." Corrales gave Cortes a phone number, which she called; she told "them" that defendant had reached out to her, and she agreed to place phone calls to defendant that would be recorded.

¶ 108     During Cortes's testimony, the State played 11 of the recordings and, after each, Cortes briefly described the purpose or context of each call.

¶ 109     During her testimony, Cortes testified that (1) neither the DEA nor MEG promised her anything for her cooperation, (2) she did not receive anything from either agency in exchange for her cooperation, (3) Corrales received nothing for her cooperation, (4) when she spoke with Corrales and he told her to call the DEA, she did not do so in hopes of getting him out early, and (5) she never had any agreement with anyone to help her husband.

¶ 110     (c) No Reasonable Probability Exists That the Alleged False Testimony,

Taken as True, Could Have Affected the Jury's Verdict

¶ 111     Having examined the evidence of defendant's guilt compared against the alleged false testimony that Cortes did not receive any benefit in exchange for her cooperation or testimony, we conclude that no reasonable probability exists that the false testimony could have affected the jury's verdict. As we have noted, defendant was convicted on the basis of his own

words and actions—namely, his statements during the recorded phone calls and arrival at the hotel with four kilograms of cocaine. The jurors did not have to rely on any witness's recounting of the phone calls; they were able to hear defendant's words directly (as translated by a court-certified translator) and assess them for themselves. Although defendant attempted to speak in a veiled manner, the meaning and purpose of the phone calls was apparent even without further explanation by the witnesses. That meaning and purpose was confirmed when defendant showed up at the hotel with four kilograms of cocaine. Importantly, defendant does not dispute that he was in possession of the cocaine when he was arrested but instead argues that he "could have been an unknowing drug mule and, thus, not guilty of the charged offenses." We disagree. The phone calls establish that defendant planned a drug deal, and his arrival with the drugs cements that conclusion.

¶ 112          Like in *Lucas* and *Barrow*, and unlike in *Oliger* and *Jimerson*, the testimony of Cortes, Agent Coulter, Deputy Boyd, and Deputy Lieferman was not material to defendant's conviction; they had no role in obtaining or describing the phone recordings or in discovering the four kilograms of cocaine in defendant's car. Cortes's testimony likewise provided context and background and, although she described the purpose of each call from her perspective, (1) her descriptions were brief, (2) the jury heard the actual phone calls for themselves through a neutral translator, and (3) our review of the record shows that Cortes's descriptions were consistent with the content of the calls themselves, making her testimony about the calls helpful, but ultimately cumulative and not material to defendant's conviction.

¶ 113          b. Failure To Disclose Evidence of a Cooperation Agreement

¶ 114          Interrelated with defendant's false testimony claim is defendant's claim that the State also violated his due process rights by not disclosing to him the existence of the alleged

agreement, which would have permitted him to impeach Cortes, Coulter, Boyd, and Lieferman at trial. Defendant adds that the evidence would have also rebutted the prosecutor's statements during closing argument that no agreement existed.

¶ 115     "[A] defendant is deprived of his constitutional right to due process of law where the prosecution fails to turn over material impeachment evidence to the defense." *Olinger*, 176 Ill. 2d at 350 (citing *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963)). "Evidence is material in this context 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* " 'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

¶ 116     Like defendant's false testimony claim, defendant's *Brady* claim also fails because the impeachment evidence would not have affected the jury's verdict. We have discussed in detail the overwhelming evidence of defendant's guilt that is unrelated to Cortes's, Coulter's, Boyd's, and Lieferman's testimony that no agreement existed. Their testimony was not material to defendant's guilt; instead, his overwhelming guilt was established by (1) his own words on the phone calls arranging the meeting and (2) his showing up at the meeting place with four kilograms of cocaine. Even if Cortes, Coulter, Boyd, and Lieferman had been impeached with evidence that an agreement existed, that impeachment would have had no effect on the jury's assessment of that independent evidence, which did not rely on, or even involve in any way, the credibility of any of the aforementioned witnesses.

¶ 117          C. Unreasonable Assistance of Postconviction Counsel

¶ 118     Defendant also argues on appeal that his postconviction counsel rendered unreasonable assistance by failing to amend the petition to allege a claim of ineffective

assistance of trial counsel for counsel's failure to use Lao's "credit" statement to impeach Cortes, Coulter, Boyd, and Lieferman, as well as rebut the prosecutor's statement during closing argument that no agreement existed.

¶ 119    A defendant who is represented by counsel in proceedings under the Act is entitled to "a 'reasonable' level of attorney assistance." *People v. Johnson*, 2018 IL 122227, ¶ 16. "Reasonable assistance" requires postconviction counsel to perform only the specific duties set forth in Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), which include (1) consulting with the defendant by phone, mail, electronic means, or in person, (2) examining the record as needed to shape the defendant's *pro se* claims, and (3) making any amendments necessary for an adequate presentation of the defendant's *pro se* claims. See *People v. Greer*, 212 Ill. 2d 192, 204-05 (2004). Fulfillment of the third obligation under Rule 651(c) does not require postconviction counsel to advance a nonmeritorious claim. *Id.* at 205.

¶ 120    A defendant asserting a claim of ineffective assistance of counsel must show that "(1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

¶ 121    In the present case, defendant's claim of unreasonable assistance fails because his underlying claim of ineffective assistance of counsel fails on its merits. Even if we assumed that trial counsel performed deficiently by failing to use Lao's "credit" statement for impeachment purposes at trial, for the reasons we have discussed relating to defendant's false testimony and *Brady* claims, defendant cannot show that he was prejudiced by the alleged error. That is to say,

even if trial counsel used Lao's "credit" statement to impeach Cortes, Coulter, Boyd, and Lieferman about the existence of an agreement or rebut the prosecutor's statement at closing argument, no reasonable probability exists that the jury would have found defendant not guilty of possession with intent to deliver cocaine in light of the independent, overwhelming evidence of defendant's guilt.

¶ 122                                     III. CONCLUSION

¶ 123          For the reasons stated, we affirm the trial court's judgment.

¶ 124          Affirmed.